Lampman vs. Van Alstyne and husband.

LAMPMAN, Respondent, vs. VAN ALSTYNE and husband, Appellants.

*November 5 — November 24, 1896.*

*Adverse possession: Court and jury: Evidence: Acquiescence in flowage: Immaterial error: Instructions: Knowledge of adverse acts: Good faith of disseisor: Boundaries.*             -

1. Evidence of adverse possession must be clear and positive, and should be strictly construed, and every reasonable presumption made in favor of the true owner; but whether or not the facts exist to make the possession adverse so as to ripen into a title under the statutes of limitation is a question for the jury under proper instructions, and their finding will not be disturbed where there is any evidence to support it.

2. The error, if any, in restricting a person claiming title by adverse possession to the conditions prescribed by the statute (secs. 4211, 4212, R. S.) was not prejudicial to the party affected by the alleged hostile title.

3. Evidence that a person claiming title to lands by adverse possession acquiesced in the use of the lands for flowage purposes, supposing the owner of the dam had that right, would not prevent his possession from being hostile.

4. Where the question of adverse possession was properly submitted to the jury under subd. 3, sec. 4212, R. S. (providing that adverse

| 94  | 417  |
| 99  | 182  |
| 99  | 559  |

| 94  | 417 |
| 102 | 408 |
| 103 | 16  |
| 103 | 17  |

| 94   | 417 |
| a106 | 147 |
| f106 | 507 |
| f106 | 520 |

| 94  | 417 |
| 109 | 298 |
| 109 | 428 |
| 109 | 447 |

| 94  | 417  |
| 117 | 322  |
| 117 | 323  |

Lampman vs. Van Alstyne and husband.

possession of any uninclosed lands may consist in using the same for the supply of fuel or fencing, or for the purposes of husbandry, or the ordinary use of the occupant), error cannot be predicated on an omission to properly explain the nature of adverse possession under such provisions, in the absence of objections to the instructions on that ground, or of a request for specific instructions.

5. In order to establish adverse possession, the entry must be open and the possession, from the beginning to the end of the period, actual in whole or in part, open, continuous, exclusive, and hostile; but it is not necessary that the acts of the adverse claimant should be such that the true owner will know of the hostile claim, if they are such as to furnish him means of knowledge.

6. The failure of the court to use the words "visible" and "exclusive" in defining adverse possession would not render the instruction erroneous, where the jury were told that the possession must be continuous, hostile, and notorious.

7. In order to obtain title by adverse possession, whether founded upon claim merely, or upon color of title, and whether simply *possessio pedis*, or, in addition, a constructive possession co-extensive with the premises described in the written instrument constituting the color of title,— good faith in the entry and occupancy is not essential; an entry by the disseisor hostile to all the world, an intention to hold the land as his own, and an actual holding of it for the statutory period being sufficient. *Woodward v. McReynolds*, 2 Pin. 268, overruled; *Watts v. Owens*, 62 Wis. 512, criticised and limited.

8. A river as a boundary in a conveyance is a line of definite location which overcomes distance and quantity, in the absence of any ambiguity in the description.

9. The failure of the court to instruct the jury respecting the burden of proof is not a material error, where there was no request to instruct in that regard and the omission was not seasonably called to the attention of the court by an exception.

APPEAL from a judgment of the circuit court for Ozaukee county: A. SCOTT SLOAN, Circuit Judge. *Affirmed.*

Action of ejectment to recover possession of about six and one-half acres of land in the S. W. ¼ of the S. W. ¼ of section 1, township 15, range 20, in Sheboygan county, Wisconsin. The Mullet river flows through the forty-acre tract mentioned, entering it on the west line about twelve chains

and twelve links north of the southwest corner; thence running in a southeasterly direction, so that, at a point about halfway across the forty, it is about six chains and forty-four links north of the south side of the forty; thence flowing easterly and northerly, reaching the east side of the forty about twelve chains north of the southeast corner. Further down the stream is a milldam and mills, which have existed since about 1850. The backwater from the dam overflows the banks of the stream to the south on such forty-acre tract, leaving a narrow strip of dry land south of the river in the west half, and a considerably wider strip in the east half. The paper title to the overflowed land and all of such forty north of the river was in defendant *Isabell T. Van Alstyne.* She derived title by descent from her mother, and by deed from a sister and co-heir, about 1877. In addition to the lands mentioned, the mother owned the mill privilege and right of flowage of all lands affected by the backwater, from about 1850 till she sold the mill property to one Dillingworth, who subsequently died, and thereafter, in 1891, defendant purchased such property. From a point about twenty-five chains directly south of the southwest corner of the forty-acre tract, and on the west line of section 12, a highway, known as the Greenbush road, crossed such line, and ran in a northeasterly direction, crossing the line between sections 12 and 1 about twenty chains east of said corner; thence northeasterly, in the S. E. ¼ of the S. W. ¼ of section 1, to a bridge across the Mullet river, called the Red bridge, at a point about twelve chains east of the west line of said S. E. ¼ of the S. W. ¼ and sixteen chains north of the south line of such forty. Northwesterly of such highway, in section 12, was a triangular piece of land, bounded on the southeasterly side by such highway, on the north by the north section line, and on the west by the west section line, containing about twenty acres. North of this tract, in section 1, northwest of the highway and south and southeast-

erly of the mill pond, was a tract of land, extending up to the Red bridge, containing twenty acres, more or less. In October, 1872, Ernst Bowman, for himself and Phillip Miller, purchased of Elizabeth Butler, who then owned the same, and took the title in his own name to lands in sections 12 and 1, including all, or substantially all, of the above two tracts, described in the conveyance as follows: "All that part of the northwest quarter of the northwest quarter of section 12, which lies northwest of the highway leading from the village of Glenbeulah to the village of Greenbush, said land being in the form of a triangle, and containing twenty acres, more or less; also all that portion of section 1 which lies on the northwest side of said highway, and between the highway and the mill pond, and extends from the above-described land to the Red bridge, said land being in the form of a triangle, and containing twenty acres, more or less." For the purpose of making a division of this land between Bowman and Miller, G. Marguard, county surveyor, was employed to survey the same, and determine definitely the line of the mill pond. This he did with reference to the Butler deed, and found the amount of land to be thirty-five acres. Thereafter, on the 8th day of November, 1872, in accordance with such survey, a division of the land was made by Bowman making a conveyance to Miller of the following: "A piece of land ten chains in width east and west, extending from the Greenbush and Glenbeulah road north to the Mullet river, being the western part of the northwest quarter of section 12, and the southwest quarter of section 1, town 15, range 20, containing seventeen and fifty one-hundredths acres, as surveyed by G. Marguard, county surveyor." May 10, 1894, Miller sold the land above described to plaintiff. After the contract of sale was made, for the purpose of consummating it, Miller tendered a deed, describing the land as in the Bowman conveyance to him, which was objected to, particularly, because it called for

seventeen and one-half acres, whereupon another deed was executed and delivered, describing the land as follows: "A piece or strip of land ten chains in width from east to west, lying in the northwest corner of section 12, bounded on the south by the Greenbush and Glenbeulah road, on the north and west by the section lines of said section; also, a piece or strip of land, ten chains in width east and west, lying in the southwest corner of section 1, bounded on the north by the Mullet river, and the south and west by the section lines of sections 1 and 2,— the whole descriptions containing twenty-three acres, more or less; the same being lands conveyed by Ernst Bowman to Phillip Miller, in town 15, range 20," etc.

Plaintiff claimed that Miller, in 1872, entered into possession of all the lands mentioned in section 1 under claim of title exclusive of any other right, founding such claim upon the Bowman deed as being a conveyance of the same to him, and continued in such possession continuously, under such claim, up to the making of the deed in 1884, and that plaintiff continued such possession thereafter till he was dispossessed by the defendant, as hereafter stated. In 1889 defendant *Isabell T. Van Alstyne* entered upon the land and built a wire fence north of the section line, and where she determined the high-water line of the water in the mill pond to be. This wire fence was built from a point on the west line of section 1 about two chains north of the southwest corner of the section; thence, on a line a little south of east, for a distance of about eight chains, to a point about one and one-half chains north of the south section line; thence, northeasterly, to a point ten chains east of the west line, and about two and one-half chains north of the south line of the section. The tract of land in dispute is that part between the wire and the thread of the Mullet river, containing about six and one-half acres. The evidence tends to show that the high-water line of the pond is south of the fence most of the way across the tract. The land in section 1

Lampman vs. Van Alstyne and husband.

south of the fence, and that in section 12, contained in the deed from Bowman to Miller and from Miller to plaintiff, contains at least seventeen and one-half acres.   The adverse possession of the disputed land consisted of the ordinary use thereof by the occupant, as alleged, for a supply of fuel and fencing timber, from the conveyance to Miller in 1872 to the building of the wire fence in 1889.

The jury found in favor of the plaintiff.  At the close of plaintiff's case there was a motion made for a nonsuit, which was overruled.   Exceptions were taken to refusals of the trial court to instruct the jury as requested; also, to various portions of the instructions given.   Based on such exceptions and other alleged errors, defendants moved the court to set aside the verdict and grant a new trial, which was overruled.   Judgment was rendered in plaintiff's favor, from which this appeal is taken.

For the appellants there was a brief by *Nash & Nash,* and oral argument by *L. J. Nash.*

For the respondent there was a brief by *C. H. Maynard* and *Francis Williams,* and oral argument by *Mr. Maynard.*

MARSHALL, J.   There are several reasons assigned for reversing the judgment appealed from, the most important of which will be treated in their order.

1. That there was no evidence of adverse possession such as the law requires.   It is a familiar principle of law that evidence of adverse possession must be clear and positive, and that it should be construed strictly, and every reasonable presumption made in favor of the true owner.   *Sydnor v. Palmer,* 29 Wis. 226; *Ayers v. Reidel,* 84 Wis. 276.   But the character of the possession, whether the facts exist or not, making it adverse, so as to ripen into a title under the statutes of limitation on the subject, are questions for the jury, under proper instructions.   Their finding in respect thereto cannot be disturbed where there is any legitimate

basis in the evidence therefor. Without taking time or space
to discuss the evidence, suffice it to say that a careful exami-
nation of the record fails to disclose any sufficient reason to
disturb the verdict on the ground that there is no evidence
to support it.

2. That the court adopted the view that the incidents
and qualities of an adverse possession of land, requisite to
vest title in the possessor, must be determined solely with
reference to secs. 4211, 4212, R. S. True, this court in effect
decided, in *Wilson v. Henry*, 40 Wis. 594, that it was not the
legislative intent, by such statutes, to restrict the conditions
of adverse possession to those particularly specified therein,
but rather to provide that certain conditions should be suffi-
cient without reference to common-law rules; that the intent
was, not to exclude common-law conditions, but to supply
others. Yet, it is not perceived how defendants could have
been prejudiced because of the case being confined to the
statutory conditions; that is to say, there being conditions
of adverse possession at common law not abrogated by stat-
ute, and others supplied by the statute, to restrict a person
claiming title by adverse possession to the latter cannot be
successfully urged as prejudicial error by the party affected
by the alleged hostile title.

3. That the adverse possession was not hostile, because
Miller acquiesced in the use of the land for flowage pur-
poses. The evidence on that point tends to show merely
that Miller supposed the owner of the milldam had the right
of flowage. That was not inconsistent with a claim of title
to the land otherwise than as so affected. Whether the title
of plaintiff is good as against the right to flow the land by
the backwater from the dam is not in this case.

4. That no sufficient occupation was shown, because that
required by sec. 4212, R. S., is not a test of adverse posses-
sion. Here, again, it appears that *Wilson v. Henry, supra,*
is misunderstood. Surely there is nothing in that case to

warrant the conclusion that the acts which will constitute adverse possession must be tested by the common law. On the contrary, as before stated, it is there held that the statute supplies new conditions, and broadens out the common-law rule on the subject. By subd. 3 it is provided that adverse possession of any uninclosed land may consist in using the same for the supply of fuel or of fencing timber, for the purposes of husbandry, or for the ordinary use of the occupant. The court properly submitted the case to the jury under that subdivision, as the evidence tended to show adverse possession under that or not at all. No exception was taken to the charge that it did not properly explain to the jury the nature of adverse possession covered by that provision of the statute, nor any request to charge specifically in that regard. It would have been very proper and helpful to the jury to have had the words, "supply of fuel or fencing timber, for the purposes of husbandry, or for the ordinary use of the occupant," explained according to the holdings of this court on the subject; but, no request in that regard having been made, no error can be predicated upon its omission.

5. That the court gave sec. 4211, R. S., to the jury as defining adverse possession. An examination of the charge fails to bear out that contention. What the learned judge did do was to state to the jury, in substance, that title by adverse possession is founded on the statute. He was speaking with reference to the case on trial. At that point he read sec. 4211. No error is perceived thus far, as plaintiff's claim is based solely on such section. After explaining it at some length, the court followed by stating, in substance, that sec. 4212 defines adverse possession as applied to the facts of this case, and closed by reading subd. 3, and instructing the jury that plaintiff must prevail under that or not at all. The jury were properly so instructed.

6. That the jury were not instructed that, to show title

by adverse possession, such possession must be visible and notorious; hence, that the court erred in refusing appellants' request, which is in the following words: "Possession is not adverse unless it is open and notorious; and the acts of ownership must be so unmistakable that the real owner, or any person having the right to challenge such possession, will not, without negligence, fail to know the hostile character of the possession." That is hardly an accurate statement of the law. It would be quite liable to mislead a jury. To be sure, the doctrine of adverse possession rests upon presumed acquiescence and laches of the owner. Therefore the acts of hostile possession must be such as to furnish to the true owner knowledge or means of knowledge. To that end the entry must not be clandestine, but open, and the possession, from the beginning to the end of the period, be actual in whole or in part, open, continuous, exclusive, and hostile. So characterized, the element of laches arises as a presumption from failure of the true owner to assert his title. It is not necessary that the acts of the adverse claimant be such that the true owner will know of the hostile claim. It is sufficient if they be such as to furnish him means of knowledge. On this point the learned judge said, in regard to possession: "It must be a continuous possession, every year, to bring it within the statute of adverse possession. I may say, it means hostile adverse possession,— hostile possession." "It must be continuous, hostile, and uninterrupted, and under claim of title exclusive of any other right." "If he went there in 1872, under claim of title exclusive of any other right, and had been in continuous possession of that part out of water; if he cut timber every year, got a supply of fuel from there year after year, you are at liberty, if you believe the evidence, to find he had possession under the statute." "If he has not [been in adverse possession], applying the rules of law,— the provisions of the statute in regard to possession being continuous, open, and notorious,— then he gets no title."

Perhaps the law might have been more clearly stated, but the charge sufficiently informed the jury of all the elements requisite to adverse possession.   To be sure, neither the word "visible" nor "exclusive" was used; but the jury were told that the possession must be continuous, hostile, and notorious.  It is difficult to perceive how the acts to which the court confined the case, such as by cutting timber and getting a supply of fuel from the land year after year, could be other than visible; and, if such acts were continuous and hostile to the true owner, how they could be otherwise than exclusive, in view of the fact that the evidence conclusively shows that the true owner, during the period in question, did not exercise any acts of ownership over the property.

7. That the court failed to instruct the jury upon the subject of Miller's good faith.   On this the defendants requested the court to charge the jury as follows: "If the evidence does not show the cutting of timber on or the pasturage of the whole tract in suit, it is necessary, to a recovery in this action of the whole tract, that the entry under the deed to Miller, and his holding under it, should have been in good faith; that is, it is necessary for you to be satisfied, by the evidence, that he honestly believed that his deed gave him a good title to the whole tract."

On this subject there is a conflict of authority, of such long standing and in respect to so many phases of the question, that it is useless to try to reconcile the various adjudications.   Such conflict is not merely between different jurisdictions, but is found in the adjudications of the same court, and it may be said that this court is not entirely free from that criticism.   This has grown out of the gradual development of the law from an early period, when it was quite generally held that only occupants in good faith could acquire title by adverse possession, to the rule obviously prescribed by the statute, but reluctantly adopted by the courts, doing entirely away with all necessity for judicial investigation into the hidden motives of the entry or posses-

sion and all questions of good faith respecting the same, and substituting instead the rule that open, exclusive, continuous, uninterrupted, and hostile possession for the statutory period, whether in good faith respecting boundaries or title, or whether applied to actual possession or actual possession of part accompanied by constructive possession of the balance included in a written instrument upon which the claim of title is based, does the work. The rule that good faith in respect to the validity of the claim of title must characterize the entry and possession is still held in some jurisdictions; in others, it is held that good faith only applies to constructive possession; and in still others, while the element is held to be indispensable, it is so limited as to be practically done away with. In the late work by Newell on Ejectment (p. 788) it is said: "Good faith in the claimant is an indispensable element in the law of adverse possession. But by the term 'good faith,' as used in this connection, it must not be understood that it involves an inquiry into the party's belief in the character or strength of his title, or whether, in fact, he has any title. What is meant by the term is simply good faith in claiming possession and title, or, in other words, a real intention to claim the land as his own, distinct and hostile to the title of the owner."

· This only illustrates the tenacity with which text writers, as well as courts, have clung to the term "good faith" as an element of adverse possession, in their efforts to harmonize the holdings of different courts on the subject. The case which Mr. Newell cites as authority for the rule as he states it is *Davis v. Hall*, 92 Ill. 85, and that does not support such rule at all, but says that good faith in such a case requires a sincere belief in the claimant that he is the owner of the premises. To say that good faith is an essential element, and then to limit it to mere intent to claim title, is to eliminate it altogether, as the intent to claim title may exist entirely

Lampman vs. Van Alstyne and husband.

independent of any element of good faith, as the term has universally been understood.

This court early laid down the rule that the claimant must enter *bona fide*, believing in good faith that the land is his, and that he has a title. *Woodward v. McReynolds*, 2 Pin. 268, following *Livingston v. Peru I. Co.* 9 Wend. 518, which was overruled in the leading case of *Humbert v. Trinity Church*, 24 Wend. 589, holding that *bona fides* is never necessary in adverse possession. That court later, in *Crary v. Goodman*, 22 N. Y. 177, tried to harmonize *Livingston v. Peru I. Co.* with *Humbert v. Trinity Church*, by drawing a distinction between the former, which arose under the champerty act, and the latter, which depended on the statute of limitation. But later, in *Sands v. Hughes*, 53 N. Y. 296, this distinction was doubted, and so the law remains in the state of New York. In the opinions of this court since *Woodward v. McReynolds*, expressions are frequently found which apparently support the doctrine of that case. In *Watts v. Owens*, 62 Wis. 512 (opinion by Mr. Justice ORTON), it is said: "The *animus* or *intent* with which the entry is made must be *bona fide*,— an entry believing in good faith that the land is his, and that he has title;" citing *Livingston v. Peru I. Co.*, *supra*. But Mr. Justice ORTON's observation in that regard was not necessary to the decision of that case, and appears to have been a personal expression of opinion, and not an announcement of the law as held by the court. That it was not the doctrine of this court at that time, and that *Woodward v. McReynolds* had long prior thereto been overruled, though not by direct reference, there is abundance of evidence. In *North v. Hammer*, 34 Wis. 425, it was said, in effect, that if the party enters, claiming title exclusively, and remains in the open, uninterrupted, exclusive possession, so claiming title, for the statutory period, that is enough, whether the title is good or not, and without regard to the claimant's belief on the subject. The same doc-

trine is found in *McMillan v. Wehle*, 55 Wis. 685, and in *Hacker v. Horlemus*, 69 Wis. 280. In the late case of *Chicago & N. W. R. Co. v. Groh*, 85 Wis. 641, LYON, C. J., said that, to maintain title by adverse possession, good faith is not essential. It is sufficient that the entry of the disseisor is hostile to all the world, that he intends to hold the land as his own, and does hold it for the statutory period of limitations. To be sure, that was said with reference to an entry and claim of title merely, where the possession was actual, not a claim under color of title, or a claim under color of title combining actual possession of a part with constructive possession of the balance described in the written instrument upon which the claim was based, leaving an opportunity for argument that it does not apply to the latter class of cases; but the language is general, and it may be taken to be the established doctrine of this court that it applies to all cases of adverse possession under the statutes of limitation of this state, whether founded upon claim merely, or upon color of title, and whether the possession be simply *possessio pedis*, or, in addition, a constructive possession, co-extensive with the premises described in a written instrument constituting the color of title. By this, the plain words of the statute are construed according to the obvious legislative intent. There is no middle ground that can be resorted to on this subject. Good faith is an essential element of adverse possession under the statutes of limitation, or it is not. The controversy should be tested and determined by the language of the statutes. We do not find it there in any literal expression,— anything to warrant a departure from the plain import of the words used. But, if this were not so, and we were to resort to considerations of their reason and spirit, the same result is reached. The statutes of limitation are statutes of repose, and their purpose should not be impaired by injecting into them by judicial construction elements that are not there.

8. It is further assigned that the court erred in holding that the deed describes the land claimed to have been adversely held. This was an important element in the case, as the title by adverse possession cannot be extended beyond the limits of the land described in the deed under which the entry and claim of title was made. *McEvoy v. Loyd,* 31 Wis. 142; *Furlong v. Garrett,* 44 Wis. 111; *Childs v. Nelson,* 69 Wis. 125. The court properly held that the foundation of plaintiff's title is the deed from Bowman to Miller. Miller had no title or claim of title, and made no entry prior to obtaining that deed. The north boundary line described in the Bowman deed is the Mullet river. That called for a line of definite location that overcomes distance and quantity, in the absence of any ambiguity in the description; and we find none.

9. Error is further assigned in that the court failed to instruct the jury respecting the burden of proof. It does not appear that there was any request to instruct in that regard, or that the omission of such instruction from the general charge was seasonably called to the attention of the trial court by an exception. Hence, no error can be predicated on such omission. *Lachner v. Salomon,* 9 Wis. 129; *Austin v. Moe,* 68 Wis. 458.

There are several other assignments of error, all of which have been considered; but there are none of sufficient importance, in our judgment, to require further notice in this opinion.

*By the Court.*— The judgment of the circuit court is affirmed.