# TARPEY *v.* MADSEN.

ERROR TO THE SUPREME COURT OF THE STATE OF UTAH.

No. 119. Argued January 25, 26, 1900.—Decided May 21, 1900.

The right of one who has actually occupied public land, with an intent to make a homestead or preëmption entry, cannot be defeated by the mere lack of a place in which to make a record of his intent.

The law deals tenderly with one who, in good faith, goes upon public lands, with a view of making a home thereon.

When the original entryman abandons the tract entered by him, and it comes within the limits of a grant to a railroad company, a third party,

coming in after the lapse of many years, and setting up the title of that entryman, does not come in the attitude of an equitable appellant.

A proper interpretation of the acts of Congress making railroad grants like the one in this case requires that the relative rights of the company and an individual entryman must be determined, not by the act of the company, in itself fixing definitely the line of its road, or by the mere occupancy of the individual, but by record evidence, on the one part the filing of the map in the office of the Secretary of the Interior, and, on the other, the declaration or entry in the local land office; and while, as repeatedly held, the railroad company may not question the validity or propriety of the entryman's claim of record, its rights ought not to be defeated long years after its title had apparently fixed, by fugitive and uncertain testimony of occupation.

THIS case comes on error to the Supreme Court of the State of Utah, and involves the title to the S.W. ¼ of section 29, township 11 north, of range 2 west. This tract is within the place limits of the grant to the Central Pacific Railroad of California. The map of definite location of that part of the road opposite this land was filed, and approved by the Secretary of the Interior, on October 20, 1868, and the entire road was constructed and accepted prior to 1870. The land is not mineral nor swamp land, nor was it returned or denominated as such; was agricultural in character; and at the date of the filing of the map of definite location there was nowhere any record evidence of a private claim. At that time no local land office had been established in the district in which this land is situated. Such office was opened some time in April or May, 1869. On May 29, 1869, this declaratory statement was filed:

" *Declaratory statement for cases where the lands are not subject to private entry.*

"I, Moroni Olney, of Box Elder County, Utah Territory, being a citizen of the United States and the head of a family, have on the 23d day of April, 1869, settled and improved the S.W. ¼ of section 29, township 11 north, of range 2 west, in the district of lands subject to sale, at the land office in Salt Lake City, Utah, and containing 160 acres, which land has not yet been offered at public sale, and thus rendered subject to private entry, and I do hereby declare my intention to claim said

tract of land as a preëmption right under the provisions of said act of 4th September, 1841.

"Given under my hand this 29th day of May, 1869.

(Signed) "MORONI OLNEY.

"In the presence of—

"ABRAHAM HUNSAKER."

Nothing further was done by Olney. He abandoned the land, and nothing appears to have been heard of him since the date of the entry. On June 20, 1896, Andrew Madsen, the defendant in error, who alleged that he had been a settler and in occupation of the tract since 1888, filed a homestead entry thereof in the local office. A contest had previously and in 1893 been instituted between the railroad company and Madsen, which was heard and decided by the register and receiver, whose decision was affirmed by the Commissioner of the General Land Office, the finding of the register and receiver, as appears from the record in this case, being—

"We find that the tract in question, which is the S.W. ¼ of section 29, township 11 north, of range 2 west, of the Salt Lake meridian, was settled upon and occupied and claimed by a qualified entryman, to wit, Moroni Olney, prior to October 20, 1868, which therefore excepted the land from the operation of the grant of Congress to the Central Pacific Railroad Company."

A certified copy of that decision in full was filed by counsel for defendant in error on the hearing in this court, and that certified copy reads as follows:

"This case arises upon an application to enter a tract of land covered by a railway selection, which it is sought to cancel, for the reason that a valid settlement had been made on the land prior to the date of the attachment of the grant to the railway company.

"Our decision is that the motion of the Central Pacific Railway Company to strike out, dismiss and expunge the depositions from the records should be denied. We therefore find the issues in favor of Andrew Madsen, and that the tract of land in dispute was reserved and excepted from the grant to the railroad company, because, first, a preëmption claim had attached

to the land in dispute at the time the line of said road was definitely fixed.

" 2d. There was a qualified preëmption claimant upon the land at that time, which brought it within the first portion of the excepting clause of the act of 1864, which provides that any lands granted by that act, or the act to which it is an amendment, shall not defeat or impair any preëmption claim.

" 3d. On the 20th day of October, 1868, the land in dispute contained the improvements of a *bona fide* settler, which also excepted the land from the provisions of the grant.

" We further find that Central Pacific Railway selection No. 3 should be cancelled as to the tract in dispute, and that Andrew Madsen should be permitted, if he so desires, to make preëmption entry covering this land.

" We decide that he should be permitted to enter the land under the preëmption law, because his right to do so—*i. e.*, his settlement upon the land—was initiated long prior to the act of March 3, 1891, repealing the preëmption law, which repealing act expressly excepted all *bona fide* claims lawfully initiated before the passage of the act."

After the decision of the Commissioner affirming that of the register and receiver, the entry was made and a patent was issued to Madsen.

Prior thereto and on January 12, 1894, this action was brought in the fourth judicial district of the Territory of Utah, county of Box Elder, by the plaintiff in error, grantee from the railroad company, to establish his title to the tract and to recover possession. In the trial court, after the issue of the patent and the admission of Utah as a State, a decree was entered in favor of the defendant. The case was taken by appeal to the Supreme Court of the State, and by that court the decree of the district court was affirmed, 17 Utah, 352, to review which decree this writ of error was brought.

*Mr. L. E. Payson* for plaintiff in error. *Mr. L. R. Rogers* filed a brief for same.

*Mr. B. Howell Jones* for defendant in error.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

A narrow but important question is presented by this record. The land in controversy is an odd numbered section within the place limits of the grant to the Central Pacific Railroad Company. The identification of the lands which passed by that grant was made at the time the map of definite location was filed in the office of the Secretary of the Interior, and by him approved, to wit, October 20, 1868, and the question is whether there was anything in the occupation or entry by Olney to defeat the title apparently then passing to the railroad company. That there was nothing of record affecting the validity of that title is conceded. No one, by an investigation of any public record, could have ascertained at that time that there was any doubt in respect thereto.

It is true that there was then no local land office in which those seeking to make preëmption or homestead entries could file their declaratory statements or make entries, and the want of such an office is made by the Supreme Court of the State one of the main grounds for holding that the land did not pass to the railroad company. We agree with that court fully in its discussion of the general principles involved in the failure of the Government to provide a local land office. The right of one who has actually occupied, with an intent to make a homestead or preëmption entry, cannot be defeated by the mere lack of a place in which to make a record of his intent. In many States the statutory provision in respect to suits is that the defendant, on receiving service of summons, must within a certain time file his answer in the office of the clerk of the court. It cannot be doubted that if, before he is thus called upon to file his answer the office is burned, and the clerk dies, and there is no place or individual at which or with whom his answer can be filed, such accident or omission will not defeat his right to make a defence, or give to the plaintiff a right to take judgment by default. Where the accident or omission is not the fault of the party but of the Government, or some official of the government, such accident or omission cannot defeat

the right of the individual, and in all that is said in respect to this by the Supreme Court of the State of Utah we fully agree. If Olney was in possession of this tract before October 20, 1868, with a view of entering it as a homestead or preëmption claim, and was simply deprived of his ability to make his entry or declaratory statement by the lack of a local land office, he could undoubtedly, when such office was established, have made his entry or declaratory statement in such way as to protect his rights. But when the office was opened he filed his declaratory statement, and in that he did not suggest that he had been in the occupation of the premises prior to October 20, 1868, but declared that on the 23d of April, 1869, he settled and improved the tract. Assume that such declaration was subject to correction by him, that he could thereafter have corrected the mistake (if it was a mistake) and shown that he occupied the premises prior to October 20, 1868, with an intent to enter them as a homestead or preëmption claim, he never did make the correction, and there is nothing in the record to show that his occupation prior to April 23, 1869, was with any intent to acquire title from the United States.

And in this respect we must notice the oft-repeated declaration of this court, that "the law deals tenderly with one who, in good faith, goes upon the public lands with a view of making a home thereon." *Ard* v. *Brandon*, 156 U. S. 537, 543; *Northern Pacific Railroad* v. *Amacker*, 175 U. S. 564, 567. With this declaration, in all its fulness, we heartily concur, and have no desire to limit it in any respect, and if Olney, the original entryman, was pressing his claims every intendment should be in his favor in order to perfect the title which he was seeking to acquire. But when the original entryman, either because he does not care to perfect his claim to the land or because he is conscious that it is invalid, abandons it, and a score of years thereafter some third party comes in and attempts to dispossess the railroad company (grantee of Congress) of its title—apparently perfect and unquestioned during these many years—he does not come in the attitude of an equitable appellant to the consideration of the court.

It must be remembered that mere occupation of the public

lands gives no right as against the government. It is a matter of common knowledge that many go on to the public domain, build cabins and establish themselves, temporarily at least, as occupants, but having in view simply prospecting for minerals, hunting, trapping, etc., and with no thought of acquiring title to land. Such occupation is often accompanied by buildings and enclosures for housing and care of stock, and sometimes by cultivation of the soil with a view of providing fresh vegetables. These occupants are not in the eye of the law considered as technically trespassers. No individual can interfere with their occupation, or compel them to leave. Their possessory rights are recognized as of value and made the subjects of barter and sale. *Lamb* v. *Davenport,* 18 Wall. 307. In that case it appeared that certain individuals settled on what is now the city of Portland, Oregon, and laying off a townsite distributed among themselves the lots. Thereafter they bought and sold those lots as things of value, and although such settlement was antecedent to any act of Congress authorizing it, their contracts in respect to the lots were sustained, the court, speaking by Mr. Justice Miller, saying (p. 314):

"And though these rights or claims rested on no statute, or any positive promise, the general recognition of them in the end by the Government, and its disposition to protect the meritorious actual settlers, who were the pioneers of emigration in the new territories, gave a decided and well understood value to these claims. They were the subjects of bargain and sale, and, as among the parties to such contracts, they were valid."

But notwithstanding this recognition of the rights of individual occupants as against all other individuals, it has been uniformly held that no rights are thus acquired as against the United States. In *Camfield* v. *United States,* 167 U. S. 518, this court sustained a bill filed by the United States to compel by mandatory injunction certain parties to vacate public lands which they were occupying without any intent to purchase, and whose occupancy therefore stood in the way of others who might wish to enter and acquire title under the land laws of the United States. See also *Frisbie* v. *Whitney,* 9 Wall. 187; *The Yosemite Valley Case,* 15 Wall. 77.

It is undoubtedly true that one occupying land with a view of preëmption is given thirty days within which to file with the register of the land office his declaratory statement, Rev. Stat. § 2264 and since 1880 the same right has been possessed by one desiring to make a homestead entry. Act of May 14, 1880, 21 Stat. c. 89, sec. 3. So that any controversy between two occupants of a tract open to preëmption and homestead entry is not determined by the mere time of the filing of the respective claims in the land office, but by the fact of prior occupancy, and these controversies are of frequent cognizance. Oral evidence, therefore, of the date of occupancy may be decisive of the controversy between such individual applicants for a tract of public land, but by decisions of this court, running back to 1882, as between a railroad company holding a land grant and an individual entryman the question of right has been declared to rest not on the mere matter of occupancy, but upon the state of the record. All the cases in this court, in which this question has been discussed and the conclusion announced, have been since the act of 1880, giving to persons seeking a homestead the same rights in respect to occupancy as to persons intending a preëmption.

The original Union Pacific Railroad act (12 Stat. 492, sec. 3) excepted from the grant of the odd sections to the railroad company all those tracts to which an adverse right had attached "at the time the line of said road is definitely fixed." The act does not in terms prescribe how or by what evidence it shall be determined that the line of said road has become definitely fixed, and for many years after its passage, interpreting this and other like railroad land grants, the ruling of the land department was that the line was definitely fixed whenever it was surveyed, staked out and marked on the face of the earth, *United States* v. *Winona .&c. Railroad*, 165 U. S. 463, 473, and that if at that time there was no adverse right the title of the railroad company was settled. Of course, this left such date one to be determined by oral testimony, and so as to each individual odd-numbered tract within the place limits of the grant the question of title was determined by evidence of the time of surveying, staking and marking on the face of the earth the line of

the railroad, and corresponding evidence of occupancy by an individual with a view to entry under the general land laws. No title, therefore, certainly passed to the railroad company until a patent had been issued to it; and, indeed, under the settled ruling that land which was held by a prior claim did not pass to the railroad company under its grant, it was doubtful whether even then it had received a title beyond challenge. This unfortunate uncertainty and instability of title continued until the decisions of this court in *Van Wyck* v. *Knevals*, 106 U. S. 360, and *Kansas Pacific Railway Company* v. *Dunmeyer*, 113 U. S. 629, the first decided in October, 1882, and the latter in March, 1885. By those cases it was settled that the time at which the title of the railroad company passed beyond question was that of the filing of an approved map of definite location in the office of the Secretary of the Interior. This eliminated all oral testimony, and established a date at which, by record, the title of the railroad company could be considered as definitely ascertained. In the latter of the two cases, *Kansas Pacific Railway Company* v. *Dunmeyer*, the same elimination of oral testimony, the same reference to the record as determining all opposing rights of the individual entryman, was also declared. That was a case of a homestead entry, but as five years prior thereto homestead and preëmption entries had been placed in the same category as far as respects the right of preliminary occupation, it is not strange that the court in that opinion spoke generally of preëmption and homestead entries.

After referring to the rule in reference to the filing of the map of definite location in the office of the Secretary of the Interior, Mr. Justice Miller, announcing the conclusions of the court, said (p. 640):

"This filing of the map of definite location furnished also the means of determining what lands had previously to that moment been sold, reserved or otherwise disposed of by the United States, and to which a preëmption or homestead claim had attached; for, by examining the plats of this land in the office of the register and receiver, or in the General Land Office, it could readily have been seen if any of the odd sections within ten miles of the line had been sold, or disposed of, or reserved,

or a homestead or preëmption claim had attached to any of them."

And again (p. 641):

" It is not conceivable that Congress intended to place these parties as contestants for the land, with the right in each to re-quire proof from the other of complete performance of its obli-gation. . . . The reasonable purpose of the government undoubtedly is that which it expressed, namely, while we are giving liberally to the railroad company, we do not give any lands we have already sold, or to which, according to our laws, we have permitted a preëmption or homestead right to attach. No right to such land passes by this grant."

And finally (p. 644):

" Of all the words in the English language, this word *attached* was probably the best that could have been used. It did not mean mere settlement, residence or cultivation of the land, but it meant a proceeding in the proper land office, by which the inchoate right to the land was initiated. It meant that by such a proceeding a right of homestead had fastened to that land, which could ripen into a perfect title by future residence and cultivation. With the performance of these conditions the com-pany had nothing to do. The right of the homestead having attached to the land it was excepted out of the grant as much as if in a deed it had been excluded from the conveyance by metes and bounds."

The doctrine thus announced, that rights on either side as between the railroad company and the entrymen are determined by the facts appearing of record, has been repeatedly recognized since. In *Hastings & Dakota Railroad* v. *Whitney*, 132 U. S. 357, these rights were discussed by Mr. Justice Lamar, who, by reason of his experience as Secretary of the Interior, was pre-eminently qualified to speak in reference thereto. And an entry which was clearly open to challenge by the government was held to be effective to withdraw the land from the operation of the railroad grant. On page 361 Mr. Justice Lamar observed:

" In the light of these decisions the almost uniform practice of the department has been to regard land, upon which an entry of record valid upon its face has been made, as appropriated

and withdrawn from subsequent homestead entry, preëmption settlement, sale or grant until the original entry be cancelled or declared forfeited; in which case the land reverts to the government as part of the public domain, and becomes again subject to entry under the land laws."

And then, after referring to the contention that the *Dunmeyer* case was not conclusive because in that case the entry was valid on its face, while this was defective, he added (p. 364):

" But these defects, whether they be of form or substance, by no means render the entry absolutely a nullity. So long as it remains a subsisting entry of record, whose legality has been passed upon by the land authorities, and their action remains unreversed, it is such an appropriation of the tract as segregates it from the public domain, and therefore precludes it from subsequent grants. In the case before us, at the time of the location of the company's road, an examination of the tract books and the plat filed in the office of the register and receiver, or in the land office, would have disclosed Turner's entry as an entry of record, accepted by the proper officers in the proper office, together with the application and necessary money, an entry the imperfections and defects of which could have been cured by a supplemental affidavit or by other proof of the requisite qualifications of the applicant. Such an entry attached to the land a right which the road cannot dispute for any supposed failure of the entryman to comply with all the provisions of the law under which he made his claim. A practice of allowing such contests would be fraught with the gravest dangers to actual settlers, and would be subversive of the principles upon which the munificent railroad grants are based."

Still later, in *Whitney* v. *Taylor*, 158 U. S. 85, in which the validity of a preëmption entry was challenged as against a railroad grant, we said (p. 94):

" But it is also true that settlement alone, without a declaratory statement, creates no preëmption right. 'Such a notice of claim or declaratory statement is indispensably necessary to give the claimant any standing as a preëmptor, the rule being that his settlement alone is not sufficient for that purpose.' *Lansdale* v. *Daniels*, 100 U. S. 113, 116. And the acceptance

of such declaratory statement, and noting the same on the books of the local land office, is the official recognition of the preemption claim. While the cases of *Kansas Pacific Railway Co.* v. *Dunmeyer*, and *Hastings & Dakota Railway Co.* v. *Whitney*, *supra*, involved simply homestead claims, yet, in the opinion in each, preëmption and homestead claims were mentioned and considered as standing in this respect upon the same footing."

And in *Northern Pacific Railroad Company* v. *Colburn*, 164 U. S. 383, we held distinctly that no mere occupation of a tract of public land in and of itself excepted that tract from the operation of a railroad grant; that a settler could not dispute the claim of a railroad company until and unless he had filed his entry in the proper land office. Still later, in *Northern Pacific Railroad* v. *Sanders*, 166 U. S. 620, 630, we said:

" Any other interpretation would defeat the evident purpose of Congress in excepting from railroad grants lands upon which claims existed of record at the time the road to be aided was definitely located. What that purpose was has been frequently adverted to by this court."

And subsequently, on page 631, we quoted, as the settled law in this respect, from *Kansas Pacific* v. *Dunmeyer* the first of the quotations therefrom heretofore given in this opinion.

If it be said that this rule ignores the privileges given to temporary occupants of land to make entry within a short time it must be said that it also denies the personal right of the railroad company to fix definitely its line of road. For when the company has by resolution of its directors established such line, and that has been marked on the ground by posts and stakes, it has done all required by the letter of the statute. If it be said that the railroad company may, notwithstanding its personal action thereafter, vote to locate its road on a different line, so on the other hand may it be said that the individual occupant of a tract may abandon his thought of entry; and by making each of the parties' rights, to wit, those of the railroad company and the individual, turn on a matter of record, the court simply gave definiteness and certainty to the congressional grant. It was said in *Missouri, Kansas & Texas Rail-*

*way* v. *Kansas Pacific Railway,* 97 U. S. 491, 497, repeated in *United States* v. *Southern Pacific Railroad,* 146 U. S. 570, 598: "It is always to be borne in mind, in construing a congressional grant, that the act by which it is made is a law as well as a conveyance, and that such effect must be given to it as will carry out the intent of Congress. That intent should not be defeated by applying to the grant the rules of the common law, which are properly applicable only to transfers between private parties." And surely Congress in making a grant to a railroad company intended that it should be of present force, and of force with reasonable certainty. It meant a substantial present donation of something which the railroad company could at once use, and use with knowledge of that which it had received. It cannot be supposed that Congress contemplated that, as in this case, a score of years after the line of definite location had been fixed and made a matter of record, some one should take possession of a tract apparently granted, and defeat the company's record title by oral testimony, that at the time of the filing of the map of definite location there was an actual though departed occupant of the tract, and therefore that the title to it never passed. The conditions are very different from those which exist between two individual occupants and claimants of a particular tract, for each is there in possession to watch and know the action of the other, and the question of right is subject to immediate and certain determination. In the present case, on the other hand, years after the title of the railroad company had apparently vested, this defendant comes in and says that this tract was excluded from the grant because somebody was in occupation, and if this can be said at the end of twenty years equally well can it be said at the end of half a century. So it is that interpreting the act making the grant as a law as well as a grant, and recognizing that Congress must have intended a present donation with reasonable certainty of identification, this court properly held that the records made in the office of the Secretary of the Interior and in the local land offices should be conclusive as between the company and the individual entryman. And if the ruling at times may oper-

ate against an individual entryman it does so more frequently against the railroad company in preventing it from claiming rights existing at the time that it in fact definitely locates its line of road.

It will be noticed that the third finding of the register and receiver states that on the 20th day of October the land in dispute contained " the improvements of a *bona fide* settler," which, as they held, also excepted the tract from the grant. This matter is also referred to in the opinion of the Supreme Court of Utah. But the exception in the amendatory act of 1864, 13 Stat. 358, of " the improvements of any *bona fide* settler," so far from sustaining the conclusion of the local officers, makes against it, for specifically exempting improvements contemplates cases in which the settler shall have a right to remove his improvements, although he may not have a right to perfect his title to the land. The exception is not of land on which are improvements of a *bona fide* settler but simply the improvements of a *bona fide* settler, thus distinguishing between a right to the land and a right to be protected in respect to the improvements.

Recapitulating, we are of opinion that a proper interpretation of the acts of Congress making railroad grants like the one in question requires that the relative rights of the company and an individual entryman, must be determined, not by the act of the company in itself fixing definitely the line of its road, or by the mere occupancy of the individual, but by record evidence, on the one part the filing of the map in the office of the Secretary of the Interior, and, on the other the declaration or entry in the local land office. In this way matters resting on oral testimony are eliminated, a certainty and definiteness is given to the rights of each, the grant becomes fixed and definite ; and while, as repeatedly held, the railroad company may not question the validity or propriety of the entryman's claim of record, its rights ought not to be defeated long years after its title had apparently fixed, by fugitive and uncertain testimony of occupation ; for if that be the rule, as admitted by counsel for defendant in error on the argument, the time will never come at which

it can be certain that the railroad company has acquired an indefeasible title to any tract.

*For these reasons, we are of the opinion that the judgment of the Supreme Court of the State of Utah is erroneous, and it must be reversed and the case remanded to that court for further proceedings not inconsistent with this opinion.*

THE CHIEF JUSTICE, MR. JUSTICE HARLAN and MR. JUSTICE WHITE dissented.