TOLTEC RANCH COMPANY, a Corporation, Appellant,
v. WILLIAM BABCOCK and LOUISA BABCOCK,
Intervener, Respondents.

No. 1327.   (66 Pac. 876.)

1. **Affidavit of Impecuniosity: Right to Jury Without Payment of Fee.**

    Under Revised Statutes, sections 1016-1018, relieving a party filing an affidavit of impecuniosity from advancing jury fees as provided by section 3129, and section 1019, declaring that on filing such affidavit such fees shall become taxable as costs at the close of the trial, it is not error to grant a trial by jury on filing of such affidavit, though the jury fee is not paid.[1]

2. **Adverse Possession: What Constitutes.**

    Open, notorious, uninterrupted and peaceable possession of land under a claim of right will be presumed to have been adverse from its inception as to the holder of the legal title, though not in its character hostile.[2]

3. **Same: Statute of Limitations: When Begins to Run.**

    Revised Statutes, sections 2859-2861, 2865, providing that the party holding and possessing property adversely to the legal title for seven years acquires title by adverse possession. Section 2865 further provides that, for the purpose of constituting an adverse possession by a person claiming title not founded on a written instrument, land is deemed to have been possessed and occupied only where it has been protected by a substantial inclosure or where it has been usually cultivated or improved. Section 2863 declares the requirements to be the same where the claim is made on a written instrument. Public lands were granted to a railroad subject to the condition of identification of the same, and defendant's vendor entered on a portion thereof after the certificate of definite location was filed. Defendant inclosed the same with a substantial fence, cultivated it as other lands in the neighborhood were cultivated, and held the same in an open, notorious, uninterrupted, and peaceable manner and under a claim of right for

---

[1]Hoagland v. Hoagland, 18 Utah 304; 54 Pac. 978.
[2]Stock Co. v. Dixon, 10 Utah 334; 37 Pac. 573.

more than twenty years after such certificate was filed. *Held*, that, though defendant's possession was not of seven years' duration since the issuance of a patent to the railroad, as the railroad took title on the filing of the certificate of location, defendand had title as against the railroad's grantee.

(Decided December 13, 1901.)

Appeal from the First District Court, Box Elder County.— *Hon. C. H. Hart*, Judge.

Plaintiff brought two actions against the defendant and intervener—the one in ejectment to recover the possession of 64 acres of land, and the other in replevin to recover for hay grown upon the land in controversy. At the trial the actions were consolidated. From a judgment in favor of the defendant and intervener the plaintiff appealed.

AFFIRMED.

*Messrs. Chase & Chase* and *T. D. Johnson, Esq.*, for appellant.

The trial court held that an affidavit of impecuniosity relieves a party from the necessity of complying with requirements of the provisions of the Constitution and statutes.

Sections 1016, 1017 and 1018 of the Revised Statutes contain all the statute law on the subject, except the provision as to stenographer's fees in criminal cases, found in chapter 72, section 7 of the Session Laws of 1899.

There is not the remotest hint in the above sections that a party, by filing a poverty affidavit, is entitled to the luxury of a jury at the expense of the county if he loses, or, if he wins, to mulct his opponent with this additional cost. We cite as authority for our position, Hoagland v. Hoagland, 18 Utah 304.

It is well settled law in this State, that to make out the

defense of adverse possession, the possession must be shown to be exclusive and continuous for the statutory period, and a compliance with the requirements of the statute respecting fencing and other improvements, and the payment of taxes; in addition it must be shown that the possession has been open, hostile, adverse, notorious, under a claim of right, and the defense must be made out by clear proof. Newham v. Salt Lake City, 7 Utah 319; Smith v. North Canyon Water Co., 16 Utah 194; Larson v. Onesite, 21 Utah 38; Center Creek Irrigation Co. v. Lindsay, 21 Utah 192.

It is well-settled law that a wife can not hold adversely to her husband while they are living together, and the fact that she was the plural wife and not the legal wife of Chester Loveland, certainly can not be taken advantage of by her. Warr v. Honeck, 8 Utah 61; Maudlin v. Cox, 67 Cal. 392.

Patent issued September 5, 1896; this action was commenced August 14, 1899; we maintain that the statute of limitations could only begin to run from the issuance of patent, and, therefore, the defense of adverse possession must fail. Steele v. Boley, 7 Utah 64; Redfield v. Parks, 132 U. S. 239.

The above question is the most serious and far reaching one presented by the record in this case. The exact question raised in the record is one as yet undecided by the Supreme Court of the United States, or by this court, but the cases cited are more nearly on all fours with this case than any other decisions made, and are in harmony with our contention, and authority for it. The trial court held against our view, because under the authority of Tarpey v. Deseret Salt Co., 142 U. S. 241, the legal title, under the grant of Congress, vested in the railroad company upon its filing of the map of definite location, and therefore the statute of limitations would, *ex proprio vigore,* run against it prior to the issuance of patent.

Our contention is that it does not follow because the railroad company may have the legal title by virtue of the grant,

that the statute of limitations runs, or that title may be acquired by adverse possession, prior to the issuance of patent. The earlier cases of the Supreme Court of the United States clearly incline to our view. Kansas Pac. R. R. Co. v. Prescott, 83 U. S. 603.

*B. H. Jones, Esq.,* for respondent; *Messrs. Brown & Henderson* of counsel.

Where a person is in possession of land for seven years, apparently as owner, and such possession is not explained or otherwise accounted for, it will be presumed to be adverse. 1 Am. and Eng. Ency. of Law (2 Ed.), 890.

A person in possession in subordination to the title of the United States may hold adversely to another claimant. Francoeur v. Newhouse, 14 Saw. (U. S.) 600; Hayes v. Martin, 45 Cal. 559; 1 Am. and Eng. Ency. of Law (2 Ed.), 876, note.

Possession, if not taken and held by contract or purchase, is, from its inception, adverse to all the world, and in seven years bars the owner in law and equity. Boone v. Ghiles, 10 Peters 177; Broman v. Wathan, 1 How. 189.

A claim of title may be sufficient, although made with knowledge of a better one. Alexander v. Pendleton, 8 Cranch 462; Ewring v. Burnet, 11 Pet. 41; See Whitney v. Wright, 15 Wend. 180.

Counsel states that the most serious and far-reaching question in the record is, Will the statute of limitations run before the issuance of the patent? This is no longer an open question. The following cases hold that the title to the lands granted took effect as of the date of the grant. Salt Company v. Tarpey, 142 U. S. 241; Tarpey v. Madsen, 178 U. S. 215.

Toltec Ranch Co. v. Babcock.

STATEMENT OF FACTS.

The record shows that the plaintiff instituted two suits against the defendants and intervener—the one an action in ejectment to recover the possession of 64 acres of land, and the other in replevin for hay and lucerne seed grown upon the land in controversy. At the trial the actions were both consolidated and tried together before a jury. The court held that the parties were entitled to a jury trial without the payment of a jury fee, as provided by statute, by reason of an affidavit of impecuniosity having been filed by the defendant, who demanded the jury. The complaint in ejectment was filed August 14, 1899, and alleged possession and ouster November 4, 1897, and unlawful retention of possession on the part of the defendant. The defendant, in his answer, denies generally the allegations of the complaint; then, *inter alia,* alleges that he holds the property in dispute as agent for his wife, the intervener; that he and his wife have been in the actual and peaceable possession of the lands and have occupied and cultivated the same for more than thirty-two years last past; and set up the statute of limitations in bar of the action. The intervener filed a similar answer and cross complaint, which also contained an allegation to the effect that the lands in controversy were excepted from the grant of lands by the United States to the Central Pacific Railroad Company. In its reply to the defendant's answer the plaintiff admitted "that said Louisa Babcock and her predecessors in interest have held and occupied the premises mentioned exclusively for more than thirty years since the entry upon the same in 1867." From the evidence it appears that the land in controversy was embraced within the grant of Congress to the Central Pacific Railroad Company; that on September 5, 1896, the railroad company received a patent for it, and on May 4, 1897, conveyed the same to the plaintiff; that the intervener, Louisa Babcock, was the plural wife of Chester Loveland; that

the latter obtained possession of the said land in 1875 or 1876, and moved his plural wife, the intervener, onto the place the same year, and afterwards gave it to her; that she lived there right along until his death, in 1886, and continued to live there ever since, and to improve and cultivate the land, and to raise and gather crops thereon for the support of herself and children; that the disputed land has been occupied, fenced, improved, and cultivated from about the year 1867; that the intervener has occupied and so cultivated the land for more than twenty-five years, and raised her family thereon; that Chester Loveland lived in Brigham City, while she was his plural wife, and lived on the land; that since 1889, when she married the defendant, she and her husband have both had their home on the premises, and tilled the land; that she always claimed it as her home and used it as her own, and that in the neighborhood it was known as the "Loveland Place." As to the payment of taxes, the intervener testified: "I began to pay taxes on this land at the death of my first husband, Mr. Loveland. It was whenever I was assessed I paid the taxes." As to who claimed and used the land, the witness Mary A. Dewey testified: "A number of people, one after another, occupied these lands from about 1864 until one Lish got it. He remained there until he sold to Mr. Loveland. I do not know just what year that was. I have known Mrs. Louisa Babcock about thirty-two years. She was the plural wife of Chester Loveland. She moved upon the land in dispute about twenty-five years ago, and has lived there ever since. She used it for a home, for farming, and cut hay to support her family. Mrs. Babcock has a family of six or seven children, who have lived with her on the land. She married Mr. Babcock ten or eleven years ago. He has been living there since that time. There is no difference at all between the way people who have occupied this land have used it and the way any other farmers used theirs." The witness Fryer said: "There were improvements on this land in '76. There was a

log cabin, a pole corral, and a cellar. Some of it was fenced in. In '69 this land was inclosed in the big field. The land in dispute for the past twenty-five years has been designated in the neighborhood as the 'Loveland Place.'" The witness Gardner testified: "Have been acquainted with Louisa Babcock since she moved out there—between twenty and twenty-five years. She tended to the land the same as the rest of us have, or had it done by her children, every year since Uncle Chester died. Before that he attended to it. During all the time that I knew Chester Loveland, Louisa Babcock was living in this house on the land in dispute, and getting the profits of the land. Loveland told me she was his plural wife, and he used to go up there and live with her. It [the land] went to her after he died. He left it to her; said that it was her home. That was the understanding of all the people—that was her land or home, left for her when he did die—that was to be her place." The witness Tarpey, who is the agent of the plaintiff, and previously had also represented the railroad company, testifying for the plaintiff, said that he had entered into a contract with Carl and Orson Loveland, sons of Chester Loveland, they claiming to represent the intervener, whereby they agreed to pay for the land; and that afterwards, in a conversation with the intervener, he found she understood all about the contract, and said Orson Loveland had agreed to purchase the land for her. The intervener, testifying, denied that she told Tarpey that she had such an agreement with Orson, and stated no contract was shown her, and that there was "no contract, no agreement, no nothing on her part." In her testimony also appear statements as follows: "I told Orson I had always claimed the 64 acres. I base my claim to the land on my husband buying it from Mr. Lish and giving it to me as my home. Twenty-five years ago my husband gave it to me as my home." There appears to be nothing in the testimony to show that during all these years—at least until after 1897, when the land was conveyed to the plaintiff—the

possession of the defendant and intervener was not peaceable and uninterrupted. It seems there was nothing to interfere with their possession until Mr. Tarpey made his appearance as agent of the plaintiff company. Under this and other evidence of similar import, and under evidence of a conflicting character, the jury found the issues in favor of the defendant and intervener, and returned a verdict of no cause of action. Upon judgment having been rendered accordingly, this appeal was prosecuted.

BARTCH, J., having made a statement of the case as above, delivered the opinion of the court.

The appellant in the first instance insists that the court erred in granting a trial by jury at the request of the defendant, without advancing the jury fees required by section 3129, Revised Statutes. The answer to this contention is that the affidavit of impecuniosity filed by the defendant relieved the party from the necessity of complying with the requirements of that section, such affidavit being provided for in sections 1016-1018, Revised Statutes. Upon the filing of the affidavit such fees became taxable as costs, under section 1019, Revised Statutes, at the close of the trial. Hoagland v. Hoagland, 18 Utah 304, 54 Pac. 978.

The controlling question in this case is whether Louisa Babcock's long-continued possession and use of the land in dispute were of such a character as to ripen into a title by virtue of the statute of limitations. The provisions of that statute which are material here are found in sections 3131-3133, 3137, Compiled Laws Utah 1888, and like provisions in sections 2859-2861, 2865, Revised Statutes. These sections fix the period of limitation as to real property at seven years, and under their provisions, where such property is held and possessed adversely to the legal title for that length of time, the party so holding and possessing acquires the title to the property by adverse possession. As to what constitutes adverse

possession of real property, it is provided in section 2865, Revised Statutes, as follows: "For the purpose of constituting an adverse possession by a person claiming title not founded upon a written instrument, judgment, or decree, land is deemed to have been possessed and occupied in the following cases only: 1. Where it has been protected by a substantial inclosure. 2. Where it has been usually cultivated or improved." The statutory provisions are the same where a person claims title founded upon a written instrument. Section 2863, Rev. St. And the same provisions are found in sections 3135, 3137, Compiled Laws Utah 1888. It will thus be seen that under our statutory provisions, where a person claims title founded on a written instrument or not founded on a written instrument, in either case the land is deemed to have been possessed and occupied adversely. Where it has been protected by a substantial inclosure, or where it has been usually cultivated or improved and where such possession and occupancy have been so continued for more than seven years, the possession can not be disturbed by the person claiming the legal title. In the case at bar, the intervener claimed title to the land in dispute by gift from Chester Loveland, who, it seems, bought it from one Lish, without, however, obtaining any other title than such as the vendor had by right of possession, the legal title to the land being then in the Central Pacific Railroad Company. The intervener thereafter always claimed the premises as her home. The land was protected by a fence—a substantial inclosure—cultivated, improved, and crops raised thereon by herself and husband for the family for admittedly more than twenty years. The land was occupied and used the same as other lands were in that neighborhood. The possession, as appears from the evidence, was open, notorious, uninterrupted, and peaceable, and under a claim of right. It must, therefore, necessarily be deemed to have been adverse to the holder of the legal title, and such long-continued possession may be deemed to have

been adverse though not in its character hostile. "Where one is shown to have been in possession of land for the period of limitation, apparently as owner, and such possession is not explained or otherwise accounted for, it will be presumed to have been adverse." 1 Am. and Eng. Enc. Law (2 Ed.), 889, 890; 3 Washb. Real Prop. (4 Ed.), 159, par. 43. The possession and occupancy, under the circumstances herein admitted and proved, were notice to all the world of the possessor's rights, and prima facie evidence of property, and of a seizin in fee; and, the longer the possession was continued undisturbed, the stronger became the conclusion that there was a legal origin for it. Busw. Lim., sec. 2. "Every possession is taken to be on the possessor's own title until the contrary appears, as the possession is in itself the strongest evidence of the claim of title, and, when long continued, of the title also." Jackson v. Hillsborough Com'rs, 18 N. C. 177. In Patterson v. Reigle, 4 Pa. 201, 45 Am. Dec. 684, on the question of adverse possession, Mr. Chief Justice GIBSON said: "There is a presumption, which lasts till it is rebutted, that an intruder enters to hold for himself; and it is not to be doubted that a trespasser entering to gain a title, though conscious that he is a wrongdoer, will accomplish his object, if the owner do not enter or prosecute his claim within the prescribed period. But to do so it is necessary that his possession be adverse from the first, and to infer that he intended it to be otherwise, would impute to him an inconsistency of purpose." Mr. Justice BALDWIN, in Boone v. Chiles, 10 Pet. 177, 223, 9 L. Ed. 388, speaking for the Supreme Court of the United States, said: "The possession of land is notice of a claim to it by the possessor. Sugd. Vend., 753. If not taken and held by contract or purchase, it is from its inception adverse to all the world, and in twenty years bars the owner in law and equity." Busw. Lim., sec. 242; Ruffin v. Overby, 88 N. C. 369; Stock Co. v. Dixon, 10 Utah 334, 37 Pac. 573; Ricard v. Williams, 7 Wheat. 59, 5 L. E. 398; Bow-

man v. Wathen, 1 How. 189, 11 L. Ed. 97; Lampman v. Van Alstyne, 94 Wis. 417, 69 N. W. 171; Talbert v. Singleton, 42 Cal. 390. But counsel for the appellant insist that the statute of limitations could only begin to run from the issuance of patent, and that, therefore, the defense of adverse possession must fail. This position would be sound if the legal title to the land had remained in the United States until the patent was issued; but such was not the case. The land in controversy constituted part of the lands granted by Congress to the Central Pacific Railroad Company. The original grant was made by the Act of July 1, 1862 (12 Stat. 489), and the amount of that grant was enlarged by the Act of July 2, 1864 (13 Stat. 356). The grant was one *in praesenti,* and vested the legal title to the land in the railroad company, subject to some conditions relating to the construction of the line of railroad, and the identification of the lands. The lands which passed by the grant became identified October 20, 1868, the date of the filing of the map of definite location in the office of the Secretary of the Interior. Tarpey v. Madsen, 178 U. S. 215, 20 Sup. Ct. 849, 44 L. Ed. 1042. Upon their identification, and the location and construction of the road, the title vested in the grantee as of the date of the grant, and the patent thereafter issued by the government was not essential to vest the legal right, but it constituted evidence that the conditions of the grant had been complied with by the grantee, and to that extent relieved the grant from the possibility of forfeiture for failure to comply with those conditions. The grantee, thus being vested with the legal title, had the right to enter upon the land, occupy, and use it after identification, the same as after the patent had been issued. On this subject, Mr. Justice FIELD, delivering the opinion of the court in Salt Co. v. Tarpey, 142 U. S. 241, 12 Sup. Ct. 158, 35 L. Ed. 999, after a review of the authorities, said: "It would, therefore, seem clear that the title which passed

under the act of Congress by the grant of the odd sections became by their identification so far complete as to authorize the grantee to take possession and make use of the lands; and in the exercise of that authority the grantee took possession from time to time as the lands became identified by the location of the line of road, and made sales of parcels of the lands, and executed mortgages on other parcels with sections of the road constructed, for the purpose of raising money to meet expenses already incurred and which might thereafter be required for the completion of the road; and such mortgages were authorized by Congress." Again, in the same case, that eminent jurist said: "While not essential to transfer the legal right, the patents would be evidence that the grantee had complied with the conditions of the grant, and to that extent that the grant was relieved from the possibility of forfeiture for breach of its conditions. They would serve to identify the lands as coterminous with the road completed. They would obviate the necessity of any other evidence of the grantee's right to the lands, and they would be evidence that the lands were subject to the disposal of the railroad company with the consent of the government. They would thus be, in the grantee's hands, deeds of further assurance of his title, and therefore a source of quiet and peace to him in its possession." So Mr. Justice BREWER, in speaking for the court in Tarpey v. Madsen, 178 U. S. 215, 20 Sup. Ct. 849, 44 L. Ed. 1042, said: "And surely Congress, in making a grant to a railroad company, intended that it should be of present force, and of force with reasonable certainty. It meant a substantial present donation of something which the railroad company could at once use, and use with knowledge of that which it had received." Van Wyck v. Knevals, 106 U. S. 360, 1 Sup. Ct. 336, 27 L. Ed. 201; Railway Co. v. Dunmeyer, 113 U. S. 629, 5 Sup. Ct. 566, 28 L. Ed. 1122; Wisconsin Cent. R. Co. v. Price Co., 133 U. S. 496, 10 Sup. Ct. 341, 33 L. Ed. 687. The railroad company having had, as

we have seen, the legal title to the land in dispute at least from time of the filing of the map of definite location with the Secretary of the Interior, and having had the right to enter upon, occupy, and use the land, there would seem to be neither reason nor authority to hold that the statute of limitations did not run against the company and its grantee as well before as after the issuance of the patent, and this even though the intervener may have supposed that her title was subordinate to that of the United States; for possession held in subordination to the title of the government may be adverse as to another claimant. Francoeur v. Newhouse, 14 Sawy. 600 (C. C.) 43 Fed. 236; 9 Am. and Eng. Ency. Law, 58; Hayes v. Martin, 45 Cal. 559.

From the foregoing considerations, and from a careful examination of the proof, we are of the opinion that the intervener is entitled to hold the land in controversy, and the crops raised thereon, by adverse possession, and that, as against the plaintiff, she has the absolute title thereto. We see nothing in the record which justifies a reversal. The judgment is affirmed, with costs.

MINER, C. J., and BASKIN, J., concur.