# BINGHAM LIVERY & TRANSFER COMPANY v. McDONALD.

No. 2083.   Decided April 29, 1910.   Rehearing Denied, July 11, 1910
(110 Pac. 56).

1. APPEAL AND ERROR—TRANSCRIPT—EXHIBITS. Exhibits offered in evidence need not be incorporated in or attached to the transcript. (Page 466.)

2. EXCEPTIONS, BILL OF—EXHIBITS. Under Comp. Laws 1907, sec. 3284, providing that in making up a bill of exceptions, documents on file in the action may be copied or the substance thereof stated, or reference thereto sufficient to identify them may be made, referring to them by their identification marks, and stating the name and character of such instrument, is enough. (Page 467.)

3. EXCEPTIONS, BILL OF—EXHIBITS. Where a map, designated in the record as Plat A but marked Exhibit G for identification, was referred to by counsel when offering it in evidence as Plat G instead of Exibit G and was during the remainder of the trial repeatedly referred to by counsel for both sides as Plat G, and the numerous references in the bill of exceptions to it as Plat G, and the fact that it is the only exhibit in the case marked "G" for identification, show Plat G and Exhibit G to be one and the same thing, the map will not be stricken from the bill of exceptions, as not identified as the map received in evidence. (Page 467.)

4. ADVERSE POSSESSION—CONTINUOUS AND OPEN POSSESSION—EVIDENCE. Evidence *held* to show possession by defendant by his use of the premises as a yard in connection with his blacksmith shop, of the continuous and open character necessary under Comp. Laws 1907, secs. 2862, 2863, for title by possession under color of title.[1] (Page 469.)

5. ADVERSE POSSESSION—INTERRUPTION. Where defendant used a lot as a yard in connection with his blacksmith shop and permitted teamsters, peddlers, and others, who had occasion to do so, to use it as a camp ground when this did not interfere with his own use and occupation of it, the occasional driving over it by plaintiff in going to and from its barn was not an interference with or interruption of his possession. (Page 473.)

6. LOST INSTRUMENTS — ESTABLISHMENT — EVIDENCE. Defendant, claiming by adverse possession under color of title, sufficiently proves the contents of a deed given him thirty years before, and since destroyed, by testimony that at such time, for a certain consideration recited and paid, the then record owner executed to him a quitclaim deed of the land, which was witnessed and acknowledged, though he cannot recite its contents.[2] (Page 474.)

Appeal from District Court, Third District; *Hon. C. W. Morse,* Judge.

Action by Bingham Livery & Transfer Company, a corporation, against R. D. McDonald.

Judgment for plaintiff. Defendant appeals.

REVERSED WITH DIRECTIONS.

[1] Pioneer Investment & Trust Co. v. Board of Education of Salt Lake City, 35 Utah 1, 99 Pac. 150; Toltec Ranch Company v. Babcock, 24 Utah 183, 66 Pac. 876.

[2] Scott v. Crouch, 24 Utah, 377, 67 Pac. 1068.

### STATEMENT OF FACTS.

Plaintiff, a corporation organized and existing under the laws of the state of Utah, brought this action against the defendant to quiet title to a certain parcel of ground described in its complaint as "situate in the town of Bingham Canyon, Salt Lake County, state of Utah, to-wit: All of lot 80 in said town of Bingham Canyon, as the same is described on Smith's survey of Main Bingham townsite." Plaintiff claimed to deraign title to the land in controversy through mesne conveyances from a United States patent called the "Valentine Patent," issued July 10, 1876, to David H. Bentley. Defendant claims the land by adverse possession in himself and his predecessors since the date of the issuance of the Valentine patent referred to, under claim of title founded upon a written instrument. The land in controversy is situated at the junction of Bingham Canyon road and Carr's Fork road, the main thoroughfares along which the town of Bingham Canyon is built. The following diagram shows the boundaries in dispute and their location, with reference to the other properties in that vicinity, and will, to some extent, aid in illustrating the questions involved.

The area of the ground in dispute is 25x100 feet, and is designated in the record, and marked on the above diagram, as lot 80. Defendant, in his counterclaim, alleged ownership to another piece of ground 30x65 feet in lot 81, contiguous to and north of lot 80. Defendant's blacksmith shop, with the exception of the southwest corner thereof, which is on lot 80, is on this 30x65 feet of ground. Plaintiff disclaimed ownership and all right of possession to the 30x65 feet of land mentioned, and that part of lot 80 upon which the southwest corner of defendant's blacksmith shop stands.

The facts upon which the respective parties rely for a recovery in this action are about as follows: Long prior to 1876 the ground represented by the diagram was used as a sawmill site and logging ground by one James Campbell under a deed from A. D. Heaton, made December 28, 1869. The sawmill stood north of the land in controversy and on what is designated in the record as lot 82. The premises lying north of lot 80 Campbell sold to parties who later on converted the buildings used in connection with the sawmill into a livery stable. In November, 1876, defendant purchased from the parties who were then in possession of the livery stable premises under a conveyance from Campbell, a piece of ground 30x50 feet in lot 81, contiguous to and north of the premises in dispute. The land lying south of this 30x50 feet and embracing lot 80 remained in the possession of Campbell, under his deed from Heaton. In 1876 defendant, after purchasing the 30x50 feet of ground mentioned, erected a blacksmith shop thereon. About the time he commenced the erection of his blacksmith shop he obtained permission from Campbell's agent and attorney in fact to occupy the 25x100 feet of ground embraced within lot 80 and to use the same as a yard for his blacksmith shop. In pursuance of the permission thus given him, defendant, in November, 1876, entered into possession of and occupied lot 80 as Campbell's tenant or licensee and used the ground embraced therein for the storing of his fuel, for the repairing of vehicles and implements, and for the storing of the same, for outhouses, and for all other purposes for which yards of this

character are generally used. Defendant continued to thus occupy the premises until 1879, when, according to his testimony, which stands uncontradicted, he purchased the land embraced within lot 80 and received a quitclaim deed thereto from Campbell. This deed, which he failed to have recorded, was lost in a fire which occurred in 1895, and which burned down his blacksmith shop and destroyed all of his books and papers. On July 10, 1876, a United States patent was issued to David H. Bentley for forty acres of land. This patent, referred to in the record as the "Valentine Patent," covers a large portion of the ground upon which the town of Bingham Canyon is built, including the premises in dispute. Soon after the patent was issued preparations were made by the occupying claimants in Bingham Canyon, including defendant, to test its validity. Bentley, the patentee, went to Bingham Canyon, and defendant informed him that he, Bentley, "had no interest in there at all." No attempt was made by Bentley, or any of his successors in interest, to take possession of the ground, and defendant has continually remained in possession of the premises embraced within lot 80, and used the same as a yard in connection with his blacksmith shop for the purposes hereinbefore mentioned. It appears that from the time defendant went into possession of lot 80 until about the time this action was commenced, plaintiff and its predecessors in interest drove over a portion of the lot in hauling hay to and manure from the livery stable. They would also occasionally leave a vehicle, when not in use, upon the premises. Plaintiff, however, does not claim any title to or easement in the property by virtue of the use thus made of it.

The claim made, if we correctly understand the position of counsel for plaintiff, is, that evidence of the use made of lot 80 by plaintiff and its predecessors tends to show that defendant was not the sole occupant of the property, and that therefore he could not, and did not, acquire title to it by adverse possession. The evidence, without conflict, shows that the use made of the premises by plaintiff and its predecessors in no way interfered with defendant's occupancy and

use of the property. George H. Davis, a witness for defendant, testified that he resided in Bingham Canyon from 1873 until the fall of 1882; that he owned and operated the livery stable mentioned; that neither he nor any one connected with the livery stable during that time claimed any title to or interest in the premises in controversy or any part thereof, and that defendant was the reputed owner of the property. The record also shows that T. R. Jones, one of the parties who succeeded to the rights conferred by the Valentine patent, and who was one of the parties through whom plaintiff deraigns its title, sent word to the occupying claimants of the land covered by the patent, before he parted with whatever interest he may have had in the property, that if they would get the land surveyed "he and his partners" would convey to each claimant the amount of ground claimed and occupied by such claimant that was within the patent; "that they (Jones and his partners) did not claim it."

In fact, the evidence shows that from 1876 until the commencement of this action, a period of twenty-eight years, no one interfered with defendant in his possession and occupancy of the land in question. One of plaintiff's predecessors in interest testified that he claimed to own the property from 1885 to 1898, when he sold it, in connection with the livery stable mentioned, to plaintiff; but there is no evidence that he ever asserted or made known his claim of ownership to defendant or to any other person. The land described in the Valentine patent was not assessed for taxes, nor were any of the parties connected with that title ever assessed for land covered by the patent, prior to the year 1891. In 1891 the entire forty acres covered by the patent was assessed at $160 in the name of Bentley, the patentee, and others holding undivided interests therein with him, the total tax being $1.39. The property was sold for these taxes. The same thing occurred again in 1892. Plaintiff in no way connects his title with these tax sale After the year 1892, until 1896, no taxes were assessed or levied against the land as described and embraced within

the Valentine patent. From the year 1878, until 1891, defendant was assessed for and paid taxes on real estate in Bingham Canyon, but no description of the real estate was given. During these years when the assessor called on defendant for the purpose of assessing his property, defendant, in listing his property, would point out to the assessor the land claimed and occupied by him. The record shows that the assessors, in their assessments of real estate for taxes in Bingham Canyon from 1878 up to and including 1893, did not describe the property, but only gave the valuation. From 1893 until 1900 only the improvements were assessed. The taxes assessed against lot 80, "Smith's Survey" since 1900 have been paid by defendant.

The first complaint filed by plaintiff in this action (April 24, 1904) contains two counts. In the first count plaintiff claims title to the easterly portion of lot 80, and in the second count it claims ownership in common with defendant to the westerly portion. On January 15, 1907, nearly three years after filing its original complaint, plaintiff filed an amended complaint containing but one count in which it claims to be the sole and absolute owner of all of lot 80, and prays for a decree quieting its title to all of said lot. Both of these complaints, which were verified by A. V. Anderson as vice president of plaintiff company, were received in evidence.

The court found in favor of plaintiff upon the issues presented, and rendered judgment quieting its title in the property. Defendant appeals.

*Weber & Olson* for appellant.

*Dey & Hoppaugh* for respondent.

APPELLANT'S POINTS.

In the early fall of 1879, plaintiff received a deed from Campbell for the particular piece of ground embraced in Lot 80. This deed was lost by appellant in a fire which occurred in 1895, and which burned down his blacksmith

shop and all his books and papers. It was the usual form of
quit-claim deed, duly made and executed before a notary
public and witnesses, and all circumstances of the formal
making and execution of the deed are given. The witness
could not, nor could he be expected to give the exact language
of the deed; if he had undertaken to do so his testimony
in this respect might be open to doubt or criticism, which is
impossible as to any of the testimony given by appellant in
this case. James Campbell, first party, by Hugh Campbell,
his attorney in fact, conveyed this ground to appellant. The
deed was made in the office of Henry Thompson, a notary
public in Bingham Canyon, and was subscribed to before
the notary and before two witnesses, and was formally ac-
knowledged before the notary, who duly signed his name and
affixed his seal to the acknowledgment. The deed described
this ground, and witness remembered that it stated that the
ground conveyed was twenty-five feet in width, and that it
extended westerly from Carr Fork road to the mountain and
adjoined the livery stable premises on the north. It refer-
red to posts which showed the boundaries of the ground, one
post at what is shown on the plat "G" as the present south-
east corner of Lot 8, Wilke's survey, being also the south-
east corner of Lot 80, Smith's survey, on Carr Fork road;
and one at the junction of main Bingham Canyon and Carr
Fork road, being the northeast corner of Lot 80. Appellant
remembered that it was in 1879 that he received this deed
by reference to a book account showing that to have been the
year when a fence was built along the north line of lot 80
from the rear corner of appellant's blacksmith shop to the
mountain. Hugh Campbell was the duly authorized attorney
in fact for James Campbell. Under this deed appellant has
claimed title since 1879. This proof of the lost deed is
sufficient. Proof of possession for a period of nearly thirty
years under claim of title being established, very slight ad-
ditional circumstances are required to establish a lost deed
under which title is claimed. (*Scott v. Crouch,* 24 Utah
377; *Harbison v. School Dis.,* 89 Mo. 184; *Perry v. Burton,*
111 Illinois 138; *Parks v. Caudle,* 58 Texas 216.)

RESPONDENT'S POINTS.

Until the contents of a deed are proved the deed is not proved, and the proof should be clear and plenary. (*Lampe v. Kennedy,* 14 N. W., 43, 45; *Thomas v. Ribble,* 24 S. E., 24, 242; *Capell v. Fagan,* 77 Pa. 55; *Cunner v. Pushor,* 29 Atl. 1083; *Louisville & Nashville Railroad Co. v. Boykin,* 76 Ala. 560; *Shackleford v. Bailey,* 35 Ill. 387; *Humphries v. Huffman,* 33 Ohio State, 395 404; *Livingston v. Iron Company,* 9 Wendell, 311, 517; *Fugate v. Pierce,* 49 Mo. 441, 447.)

It is obvious where a deed containing no description of the land is relied on to give color of title that it will be ineffectual for that purpose.

(Buswell Lim. and Adverse Possession, p. 353.)

A deed is color of title only to the extent that the premises are described in the conveyance.

(*McEvoy v. Lloyd,* 31 Wis., 142.)

The description is the most essential part of the deed under this statute, for it determines the extent of the constructive possession arising from the actual possession of a part.

(*Wilson v. Atkinson,* 77 Cal., 485; *Murphy v. Doyle,* [Minn.] 33 N. W. 220, 221.)

McCARTY, J., after stating the facts, delivered the opinion of the court.

Respondent has filed a motion to strike from the record certain documents, consisting of plats, deeds, tax receipts, and other papers (marked Exhibits "A" to "V") that were received in evidence, on the ground "that the same are not authenticated by the clerk of the court below nor transmitted by said clerk, nor do the same constitute any part of the transcript certified on appeal by the clerk of the court below." This motion is followed by another to strike from the record the bill of exceptions on the ground that it shows on its face that it does not contain all the evidence received upon the trial; that certain documents ("A" to "V," exhibits)

introduced in evidence, material to the consideration of the errors assigned, are omitted from the bill of exceptions and the transcript. It appears that each of the documents and papers referred to in the motions to strike was produced at the trial, shown to and identified by witnesses as being the identical instrument or thing that it purported to be, marked for identification by the court stenographer, and then introduced in evidence. The references made in the transcript of the proceedings to each document, paper, or thing, introduced in evidence as an exhibit are not only referred to by their identification marks, but the name and character of each document or thing marked as an exhibit is stated in the record. It would be difficult to make a record more full and complete in this respect than the one before us, without reading the entire contents of each exhibit, consisting of written or printed matter into the record. The certificate of the judge to the bill of exceptions recites "that the above and foregoing bill of exceptions contains all of the testimony and all of the evidence given and introduced or offered upon the trial of said cause, and all of the objections and motions made with respect thereto, and all of the rulings of the court upon such objections and motions, and all of the exceptions to such rulings, and particular reference sufficient to identify all of the documentary evidence given and introduced or offered upon said trial." It is contended in support of the motions: First, that as the exhibits were neither incorporated in nor attached to the transcript on appeal, they are no part of the bill of exceptions and cannot be considered by this court; second, that the reference made to the exhibits in the certificate of the judge to the bill of exceptions is not sufficient to identify them, and to prevent this court from being imposed upon by the substitution of documents and papers not in the record for those that were received in evidence, and made a part of the bill of exceptions. We think the contention is wholly without merit.

In answer to the objection that the exhibits are neither incorporated in nor attached to the transcript, it is sufficient

to say that the statute makes no such requirement, and if it did it would require something to be done which, in many cases, would be an impossibility. It is not an unusual thing for exhibits received in evidence in the trial court and used in this court on appeal to illustrate the issues, facts, and questions involved, to consist of maps, documents, and records too numerous and bulky to attach to the transcript. And in some cases exhibits consisting of models made of iron or heavy pieces of timber are brought here as part of the record on appeal. In such cases it would be impossible to incorporate the exhibits in or to make them a part of the transcript. Section 3284, Comp. Laws 1907, among other things, provides that in making up a bill of exceptions "documents on file in the action or proceeding may be copied or the substance thereof stated, *or reference thereto sufficient to identify them may be made.*" (Italics ours.) As we have observed, the references made in the bill of exceptions to the exhibits are sufficient to enable this court to readily identify them, and this is all that the statute requires in that respect.

A map showing the location of the land in dispute, with reference to streets and other properties in the immediate vicinity, and designated in the record as "Plat A," was used by both parties at the trial to help illustrate the evidence given by many of the witnesses. This map was marked "Exhibit G" for identification. In offering it in evidence counsel for appellant referred to the map as "Plat G" instead of "Exhibit G." Counsel for respondent strenuously insist that the map should be stricken from the bill of exceptions, because not identified as the map admitted in evidence. The record shows that after the map was received in evidence counsel on both sides, during the remainder of the trial, repeatedly referred to it as "Plat G." The numerous references made in the bill of exceptions to this map as "Plat G," and the fact that it is the only exhibit in the case marked "G" for identification, conclusively shows that "Plat G" and "Exhibit G" are one and the same thing.

The motions to strike are denied. The conclusions here

reached are fully supported by the following authorities. (3
Ency. Pl. & Pr. 430, and cases cited; 2 Spelling New Tr.
and App. Pro. section 447, Elliott on App. Pro. sections 818,
819; 3 Cyc. 58.)

Appellant has assigned several errors in which he assails
the findings of fact made by the court and the judgment
rendered thereon. It is contended that the findings of fact
are not only unsupported by, but are contrary to, the evidence.
As we observed in the foregoing statement of facts, appellant
claims that he acquired title to the premises in dispute by
continuous, open, uninterrupted, adverse possession of the
same for a period of more than twenty years under claim of
title founded upon a written instrument, as provided in sec-
tions 2862, 2863, Comp. Laws 1907, which, so far as mate-
rial here, are as follows:

"2862. Whenever it shall appear that the occupant, or those under
whom he claims, entered into possession of the property under claim
of title exclusive of other right, founding such claim upon a written
instrument, as being a conveyance of the property in question, . . .
and that there has been a continued occupation and possession of the
property incuded in such instrument, . . . or of some part of the
property under such claim, for seven years, the property so included
shall be deemed to have been held adversely, except that when the
property so included consists of a tract divided into lots, the possession
of one lot shall not be deemed a possession of any other lot of the same
tract.

"2863. For the purpose of constituting an adverse possession by any
person claiming a title founded upon a written instrument, . . .
land shall be deemed to have been possessed and occupied in the fol-
lowing cases. . . . 2. Where it has been protected by a substantial
enclosure. 3. Where, although not enclosed, it has been used for the
supply of fuel or of fencing timber for purposes of husbandry, or for
pasturage, or *for the ordinary use of the occupant.*" (Italics ours.)

With the exception of a slight, unimportant change in
section 2862, the foregoing has been the law of Utah since
1876. See sections 1101 and 1102, Rev. St. 1876, sections
3134 and 3135, vol. 2, Comp. Laws 1888, and sections 2862
and 2863, Rev. St. 1898.

The first point to be determined is: Does the evidence
show that the appellant's possession of the premises

was of the continuous and open character contem-      **4**
plated by the statute? We are clearly of the opinion
that it does. The evidence, without conflict, shows that
from November, 1876, until the commencement of this ac-
tion appellant used lot 80 as a yard in connection with his
blacksmith shop, one corner of which was on said lot. He not
only used this building, which contained two rooms or apart-
ments, as a workshop, but during all these years occupied
it as his residence. The room or apartment on the east and
facing the street he used as a blacksmith shop and the back
or west apartment as an office and living room. On this
point appellant testified, and his testimony is corroborated
by several other witnesses who testified in reference to the
same matter, as follows: "I had need of this twenty-five
feet of ground (lot 80) to the south of my blacksmith shop
for repairing wagons, sleighs, and things like that. I have
never had any other place for my blacksmith yard during
all of the time I have been in possession there. My resi-
dence was in the blacksmith building. I slept there and
batched there. I kept a stove there and had a lot of coal and
firewood on the south line of lot 80 for heating tires. I left
wagons and sleighs on lot 80 and did repair work there."

Appellant built an outhouse, or water closet, on lot 80
which was used as an appurtenance to his home and black-
smith shop during his occupancy of the premises. By refer-
ring to the map or diagram in the foregoing statement of
the facts it will be observed that the owners of the adjoining
property on the north and on the south of this lot have con-
structed buildings near and in some instances contiguous to
the boundary lines thereof, but on no occasion have they, or
any of them, so far as shown by the record, ever attempted
to encroach upon the property in controversy with their im-
provements or in any manner interfere with appellant's
occupancy of the same, until the commencement of this ac-
tion. One of these buildings was constructed and main-
tained by respondent north of and contiguous to lot 80. In
fact, the only interest respondent claimed in the west half
of the lot prior to the filing of its second amended com-

plaint (January 15, 1907) was the right to use that portion of it in common with appellant. This is manifest from the fact that it is alleged in the original complaint and in the first amended complaint, both of which were verified by A. V. Anderson, vice president and secretary of the company, and who, as shown by the record, has been familiar with the facts and circumstances under which appellant claimed the property since 1898, "that plaintiff is now, and with its grantors and predecessors in interest for upwards of seven years last past has been, the owner in fee simple of the right to use and possess *in common with the said defendant, the west half of lot* 80." And in the prayer of this complaint it is asked that it be adjudged and decreed to "be the owner in fee simple of the right to use and possess in common with said defendant of the premises hereinbefore described." In 1878 appellant built a fence along the north line of lot 80, extending from a point near the southwest corner of the blacksmith shop to the northwest corner of the lot. This fence he maintained until 1895 when it was destroyed by fire, which also burned down the blacksmith shop. Carr's Fork creek on the west, and the mountain which rises abruptly from the creek to the west, formed the westerly boundary of the lot, and we think it may be fairly inferred from the evidence that appellant, during his occupancy of the land, has paid all the taxes that have been assessed against it.

It is contended that because respondent and its predecessors in interest occasionally passed over lot 80 in hauling hay to and manure from the livery stable appellant's possession was thereby interrupted, and hence not continuous. The Supreme Court of California has repeatedly defined what constitutes "possession and occupancy" under a statute which is identically the same as the statute of this state. In *Coryell v. Cain,* 16 Cal. 573, Field, C. J., in speaking for the court, said:

"By actual possession is meant a subjection to the will and dominion of the claimant, and is usually evidenced by occupation—by a substantial enclosure—by cultivation, or by appropriate use, according to the particular locality and quality of the property."

In *Wolf v. Baldwin,* 19 Cal. 313, it is said:

"Possession which is accompanied with the real and effectual enjoy-
ment of the property" is sufficient. "It is the possession, which follows
the subjection of the property to the will and dominion of the claimant
to the exclusion of others; and this possession must be evidence by occu-
pation or cultivation, or other appropriate use, according to the locality
and character of the particular premises."

Baldwin, J., concurring, says:

"It must, in other words, be an open, unequivocal, actual possession,
notorious, apparent, uninterrupted, and exclusive, carrying with it the
marks and evidences of ownership, which apply in ordinary cases to
the possession of real property."

See also, *Brumagim v. Bradshaw,* 39 Cal. 24; *Webber v.
Clark,* 74 Cal. 11, 15 Pac. 431; *Kockemann v. Bickel,* 92
Cal. 665, 28 Pac. 686; 1 Cyc. 999; 2 Ency. L. & P. 366.

*Holtzman v. Douglas,* 168 U. S. 278, 18 Sup. Ct. 65, 42
L. Ed. 466, was a case in ejectment. In that case, as here,
the defense of adverse possession was interposed. The use
made of the premises in that case was somewhat similar to
the use made of lot 80 by the defendant in this case. In
the course of the opinion the court summarized and com-
mented on the evidence as follows:

"It was testified on behalf of the defendants that some time in the
latter part of the same year, 1865, one Richard Rothwell, a stonecutter
and builder, who owned and occupied an adjoining lot, deposited upon
the rear of the lot in controversy some pontoons, which he had pur-
chased from the United States, and which he stored there until he
could make some disposition of them; and that he afterwards used a
part of this lot for the deposit of stone and marble which he used in
his business. He testified that he had deposited three or four wagon-
loads of marble there as early as the year 1867, and that some of the
pontoons remained in the lot four or five years. He also testified that,
in the year 1870, he commenced to deposit stone there in large quan-
tities; and that in 1872 he erected a small shed on the lot in which to
carry on his work, and which he replaced with a larger structure in
or about the year 1882. . . . Although there was no fence around
this lot during the period in question, yet it was occupied by the ten-
ant for the purpose of his business, that of marble and stone cutting;
and although every foot of the property was not covered by his ma-
terial, yet it was placed upon the lot in a convenient manner to be
used by him in the prosecution of his business, and in a manner which
showed that his possession was not in connection with any others, but
was exclusive and perfect in himself. . . . We agree with the court

below when, through Mr. Justice Morris, it says that: 'Short of an actual enclosure, it is not easy to conceive of a use and occupation more sharply distinctive and adverse than the conversion of the property into a stoneyard, with the stone practically scattered all over it, according to the testimony of one or more of the witnesses.' "

Moreover we think the facts in the case at bar clearly bring it within the doctrine announced by this court in the case of *Pioneer Investment & T. Co. v. Board of Education* (recently decided by this court), 35 Utah, 1, 99 Pac. 150. In that case the question of adverse possession was involved and Mrs. Justice Frick, speaking for the court, in the course of the opinion, says:

"It is not the mere possession that determines the rights of the parties, but it is the character of the possession that controls. But how is the character of the possession to be determined? It cannot always be determined from the declarations of the party in possession, because he may not make any, nor are his declarations always conclusive as against one claiming under him. Whenever the possession is of such a character that ownership may be inferred therefrom, then the possession ordinarily may be presumed to be hostile to the rights of the true owner; that is, if a party places permanent structures upon the land belonging to another, and uses the land and structures the same as an owner ordinarily uses his land, then in the absence of something showing a contrary intention, a claim of ownership may be inferred in favor of the party in possession."

Attention is also invited to the case of *Toltec Ranch Co. v. Babcock*, 24 Utah, 183, 66 Pac. 876, wherein this court, speaking through Mr. Justice Bartch, says:

"The land was occupied and used the same as other lands were in that neighborhood. The possession, as appears from the evidence, was open, notorious, uninterrupted, and peaceable, and under a claim of right. It must, therefore, necessarily be deemed to have been adverse to the holder of the legal title, and such long-continued possession may be deemed to have been adverse, though not in character hostile. 'Where one is shown to have been in possession of land for the period of limitation, apparently as owner, and such possession is not explained or otherwise accounted for, it will be presumed to have been adverse.' (1 Am. and Eng. Enc. Law [2d Ed.], 889, 890; 3 Washb. Real Prop. [4th Ed.], 159, par. 43.)"

As we have observed, lot 80 was used by appellant as a yard in connection with his blacksmith establishment. And

the evidence shows that he permitted teamsters, peddlers, and others who had occasion to do so, to use it as a camp ground when such usage did not interfere with his own use and occupation of the lot. Under these circumstances the occasional driving over the ground used as a yard by respondent in going to and coming from its barn was in no sense an interference with appellant's possession.

We now come to what we deem to be the most difficult question presented by the appeal, namely: Does the evidence show that appellant had color of title to the premises during his occupancy of the same? Appellant testified that in the fall of 1879 he received a quitclaim deed to the property from James Campbell, through H. Campbell, who, the record shows, was at the time the agent and attorney in fact for James Campbell, with full power to sell and dispose of his real estate, and to execute and acknowledge deeds for the same for him and in his name; that the consideration mentioned in the deed was fifty-five dollars the amount that he paid Campbell for the land; that he saw H. Campbell sign the deed and duly acknowledge it before a notary public; that the notary public signed the same and put his seal thereon; that it was attested by two witnesses; that he failed to have the deed recorded, and that it was destroyed in the fire that burned down his blacksmith shop in 1895; that the notary public before whom the deed was acknowledged by H. Campbell and one of the subscribing witnesses (giving the name of each) are dead; that he read the deed at the time it was delivered to him by H. Campbell, and that it was in the usual form, "in what they called the legal form in those days."

He further testified that he could not give the exact language of the deed, but did recollect that in substance it read: "James Campbell, first party, by Hughey Campbell attorney in fact . . . to R. D. McDonald, quitclaim deed for certain ground from a certain point to the southeast corner, then running southwesterly to a point (referring to map, "Exhibit G"), then running westerly to the mountain—

going on to the livery ground on the north, then back to point of beginning. . . . At the time there were posts there to which this instrument referred. One at what is shown on Plat "G" as southeast corner of lot 8 (Lot 81) . . . and the southeast corner of Lot 80 of Smith's survey on Carr's Park road, and there was a post at the corner at the junction of Main Bingham Canyon and Carr's Fork road. The deed referred to these posts and said the land went back to the mountain westerly, and it said the ground was twenty-five feet wide." On cross-examination the witness stated that he did not remember the language of the calls of his deed, but he did insist that "it (the deed) was the same language used them days by (in) quitclaim deeds. Cannot give the language of the description, only mentioning about them posts and running west so many feet. He (Campbell) showed me the lines. All that I remember is it was the usual form them days, the names of the parties, the description of the property, and they showed me the boundaries, and the posts were there. Q. You cannot give us either in words or substance the description as it appeared on that paper, can you? A. Not exactly; I could not." Other witnesses who were familiar with the premises in 1887 and for many years thereafter, testified to the existence of the posts referred to by appellant in his testimony as being mentioned in the deed.

Counsel for respondent insist that this evidence was insufficient to prove the contents of the deed, and that, therefore, appellant wholly failed to show that he held possession and occupied the property in question under claim of title founded upon a written instrument as required by the provisions of the statute hereinbefore mentioned. The trial court evidently took the same view. In this we think the court erred. To hold that the evidence in this case was sufficient to prove the contents of the deed, which, as we have stated, was made and executed nearly thirty years before the evidence was offered would, in most cases, exclude secondary proof of the contents of a lost deed. This same question was before the Supreme Court of Illinois

in the case of *Perry v. Burton*, 111 Ill. 138, and that court, in the course of a well-considered opinion, said:

"A witness testifying to the contents of a lost deed is not expected to be able to repeat it verbatim from memory. Indeed, if he were to do so, that circumstance would, in itself, be so suspicious as to call for an explanation. All that parties, in such cases, can be expected to remember, is *that they made a deed, to whom and about what time, for what consideration, whether warranty or quit claim and for what property.* To require more would, in most instances, practically amount to an exclusion of oral evidence in the case of a lost or destroyed deed." (Italics ours.)

See also, *Parks v. Caudle,* 58 Tex. 216; *Eming v. Diehl,* 76 Pa. 374; *Scott v. Crouch,* 24 Utah, 377, 67 Pac. 2068.

The judgment is reversed with directions to the trial court to set aside its findings of fact heretofore made and filed in the cause, and to make findings in favor of appellant (defendant), and to enter a decree thereon, in accordance with the views herein expressed. Costs to appellant.

STRAUP, C. J., and FRICK, J., concur.