SALINA CANYON COAL CO. v. KLEMM et al.

No. 4808. Decided July 18, 1930. (290 P. 161.)

374

*B. L. Liberman* and *A. C. Inman,* both of Salt Lake City, for appellant.

*P. G. Ellis,* of Salt Lake City, for respondents.

Motion to Dismiss Appeal.

BRAMEL, District Judge.

The Boston Acme Mines Development Company, an intervener in the court below and a respondent and cross-appel-

lant here, moves to dismiss the appeal of the Salina Canyon Coal Company. This court will notice the following grounds of the motion: (1) Klemm, who was a party defendant in the court below, was not served with notice of appeal; (2) the notice of appeal does not sufficiently describe the judgment appealed from; (3) the notice of appeal was not filed in the court below within six months after the entry of the judgment appealed from.

1. Mr. Klemm filed a disclaimer in the court below. True, he did not label his pleading with the name "disclaimer," but it was in substance a disclaimer. It denied that plaintiff owned any interest in the land in question, alleged that the intervener Boston Acme Mines Development Company owned the said property, and further alleged that all the agreements and payments made in the name of Klemm were made by said Klemm for the use and benefit of said Boston Acme Mines Development Company. The said development company intervened in said action, set up its claim to the property involved herein, and alleged that Klemm was its agent and representative in the transaction and that he had or claims no interest in the premises except on behalf of said intervener. And Klemm, as treasurer of the development company, verified the answer wherein it makes these allegations. The trial court also found and decreed that Klemm had no interest in the transactions. Our opinion is that Klemm disclaimed all interest in the subject-matter of this action and ceased to be a party thereto and that the litigation was taken over and carried on by his principal.

There also remains some doubt as to whether an attorney who appeared in the case for Klemm and signed papers as Klemm's attorney a number of times, and who never notified opposing counsel of his withdrawal as such attorney, was not Klemm's attorney for the purpose of being served with notice of appeal. Our statutes seem to imply that an attorney who has appeared for a party may

be treated as such by opposing counsel until opposing counsel are notified of dismissal or change of attorneys. Comp. Laws Utah 1917, §§ 329 and 7030; *Lacoste* v. *Eastland,* 117 Cal. 673, 49 P. 1046. However, the answer of Klemm and the answer of the intervener, verified by Klemm, and the evidence, findings, and decree, show that Klemm was merely the agent of the intervener and had no individual interest whatever in the subject-matter of the action. One who disclaims need not be served with notice of appeal. *Plough* v. *Nelson,* 49 Utah 35, 161 P. 1134; *State Bank* v. *Mortensen,* 66 Utah 290, 241 P. 1055; *Castle* v. *Delta L. & W. Co.,* 58 Utah 137, 197 P. 584. There is no merit in the first ground of the motion.

2. The description of the judgment is sufficient. A mere clerical error in specifying the date of the judgment and a typograhpical error in using the word "interveners" instead of "intervener" are not sufficiently mystifying to mislead anybody in a case where there is only one judgment to be appealed from. This is so held in many cases. *Price* v. *Western L. & S. Co.,* 35 Utah 379, 100 P. 677, 19 Ann. Cas. 589; *Swasey* v. *Adair,* 83 Cal. 136, 23 P. 284; *Ferrari* v. *Beaver Hill Coal Co.,* 54 Or. 210, 94 P. 181, 95 P. 498, 102 P. 175, 1016; *Estate of Nelson,* 128 Cal. 242, 60 P. 772; *Jones* v. *Iverson,* 131 Cal. 101, 63 P. 135. There is no merit in the second ground of the motion.

3. The third ground in the motion is that the notice of appeal was not filed within six months after the entry of judgment. The motion was served on the last day and in time, and on the same day was telegraphed to the clerk of the trial court and the telegraph copy was filed. Next day the original was filed. Comp. Laws Utah 1917, § 6117, provides that whenever any notice, information, or intelligence, written or otherwise, is required to be given, the same may be given by telegraph, and that the dispatch, if sent by telegraph, shall be delivered in writing to the person entitled thereto, his agent or attorney. This pro-

vision permitted the copy for filing to be sent by telegraph. There is no merit in the third ground of the motion.

The motion to dismiss the appeal is denied.

## Motion to Strike the Bill of Exceptions.

Respondent Boston Acme Mines Development Company also moves that appellant's bill of exceptions be stricken, chiefly on the following grounds: (1) That the draft of the bill of exceptions served upon respondents did not have the exhibits attached; (2) that no notice of the time and place the bill would be presented to the judge for settlement was given respondent, and no notice of the time the judge would settle the bill was given; (3) that the bill was not settled in time; and (4) that it does not appear from the record that the bill was filed with the clerk of the trial court.

1. Passing upon these objections in their order, it may be said that our statute provides that documents on file in the action or proceeding may be copied into the bill of exceptions, or the substance stated or a reference thereto sufficient to identify them may be made. Comp. Laws Utah 1917, § 6967. A bill of exceptions need not set out in full or state the substance of an exhibit, nor is it required that the exhibit be attached to the bill. A reference to the exhibit by its identification mark or number is sufficient. *Bingham L. & T. Co.* v. *McDonald*, 37 Utah 457, 110 P. 56. There is no merit in the first ground of the motion.

2. As to the second ground of the motion, it may be said that each and every prescribed step in the preparation of a bill of exceptions is not necessarily and of and in itself a jurisdictional prerequisite. Comp. Laws Utah 1917, § 6969, as amended by Laws Utah 1925, c. 51 provides in substance that the party upon whom the proposed bill of exceptions is served, may within ten days thereafter prepare amendments thereto and serve the same or a copy

thereof upon the other party, and that the party seeking settlement of the bill must within ten days thereafter, and upon five days' notice to the adverse party, present the bill to the judge for settlement. Now, in these provisions we note that the party against whom the bill is proposed may, when the bill is served upon him, do one of two things, viz.: He may deliver to his opponent an original draft of his proposed amendment, or he may give him a copy thereof. If a mere copy, not authenticated with proper signature and not competent to become a record of the court, is served, it might well indicate that the party wished to present his amendments personally at the time the proposed bill was presented, and in that case a failure of the proponent of the bill to give notice might be very material. But in the case at bar the original properly signed proposal of amendment was served upon the counsel for appellant and delivered to him when respondent returned the proposed bill of exceptions. This book of proposed amendments was delivered with the bill to the judge. The judge considered and ruled upon the proposed amendments. Some of them he allowed and some he rejected. Everything respondent could have done if he had been served with notice of the time and place the documents would be presented to the judge was done for him by his opponent. No prejudice to respondent resulted from failure to receive notice of the presentation of the documents to the judge. The statutory requirement that the clerk give the parties notice of the time the judge will settle the bill is purely directory. To hold otherwise would make the appellant responsible for the acts or defaults of the clerk. Nothing in the case of *Van Why* v. *Southern Pac. Co.*, 31 Utah 15, 86 P. 485, conflicts with the above. In the Van Why Case there was doubt as to whether the proponent of the bill of exceptions presented the proposed amendments to the judge, and there were also several other uncertain matters in the proceeding. There is no merit in the second ground of the motion.

3. The record contains motions for orders and orders extending the time to prepare the bill, and the bill of exceptions contains recitals that these orders were made and the bill was signed within the time given. If the record's statement that such orders were in fact made is challenged, the full record upon which respondent bases his challenge should be produced in court. The rules of this court provide a method for supplementing the record in such cases, but respondent has not seen fit to avail himself of the same. There is no merit in this ground of the motion to strike.

4. As to the point that the record fails to show that the bill of exceptions was ever filed with the clerk of the trial court, a more serious question arises. In order to become a record in this court, the bill of exceptions must be first filed in the court below. The mere absence of the filing stamp of the clerk is not a fatal defect. The omission of the filing stamp is not fatal, if the bill of exceptions was filed as a matter of fact. *Billings* v. *Parsons,* 17 Utah 22, 53 P. 730. The bill of exceptions in this case consists of three large volumes of typewritten matter inclosed in black cloth board covers. No filing mark appears on any volume. The records of this court show that all the records and transcripts in this case came, in the due course, to the clerk of this court from the court below. Under such circumstances we feel that in the absence of any showing or suggestion that the document was not delivered to the clerk of the trial court for filing, the contention of the respondent is not well founded. Motion to strike the bill of exceptions denied.

### As to the Merits of the Case.

A statement of all the evidence in this case would be of great length and of little utility. This is the eighth year of this litigation. The trial of the case lasted nearly a month. The dramatis personae in the performance that resulted in

this litigation are numerous and of various degrees of importance. The bill of exceptions, to which respondent proposed over 100 amendments, most of which called for further enlargement, consists of more than 1,200 typewritten pages. With this there is a packet consisting of about 200 letters, documents, and papers which counsel aptly call "the batch of exhibits." In addition to these, there is a large volume of pleadings, motions, and orders and records of the trial court.

The appellant assigns 61 alleged errors of the trial court. The respondent and cross-appellant assigns 10 alleged errors. To aid this court in obtaining a clear understanding of points presented in this appeal, counsel have furnished 872 pages of printed abstracts and briefs. The essential and controlling facts in this case are as follows:

The Boston Acme Mines Development Company is and at all times mentioned in this case was a corporation organized under the laws of Arizona. The Boston Acme Mines Corporation is and at all times involved herein was a Delaware corporation. The above-named development company is the corporation that did business in Utah. The mines corporation is and was a holding company. It loaned money to the development company and owned or had call rights to most, if not practically all, of the capital stock of the development company.

Emil J. Klemm was a director and the secretary and treasurer and managing agent for the development company and as such agent made for it, and not for himself, certain contracts or options for the purchase of the coal lands involved in this action.

The three Mattson brothers owned, subject to payments to be made to the state of Utah, and were in possession of, certain coal lands in Sevier county, Utah. Carl A. Mattson and Barnard E. Mattson, two of the brothers, owned, subject to payments of purchase price to be made, the parcels called tract 1 and tract 2. The third tract, called tract 3,

was seemingly owned by or in the name of the third brother, F. A. Mattson, but the other two brothers, seemingly, had an interest therein. All the lands in controversy were being purchased by the Mattsons under contracts with the state of Utah. These contracts called for payment of the purchase price in specified installments.

On or about October 4, 1920, said Klemm, in his own name, but acting for the development company, made a contract with Carl and Barnard Mattson, wherein they gave him an option to purchase tract 1 for $25,901.25, payable $1,000 October 10, 1920, and the balance in deferred payments. The $1,000 was paid at the time the agreement was delivered. After further negotiations had taken place and on or about January 19, 1921, Klemm (in his own name as agent) and the Mattsons entered into a new agreement covering tracts 1 and 2 and seemingly covering one-third interest in tract 3. The terms of the option were that the purchase price should be $27,305.15; that $12,338.99 of said sum should be paid to E. W. Senior to be turned over to the state of Utah, to pay the purchase price to the state of Utah and thereby procure patents to the Mattsons; and the balance, $14,906.18, should be paid to said Mattsons within five months after patents from the state issued to them. At or about the time the above contract was executed, a deed for the third interest in tract 3 was executed by F. A. Mattson and wife to Klemm, trustee, and given to the two Mattson brothers to deliver to Klemm when he had paid the purchase price mentioned in the contract. At the time the contract was made, Klemm was laboring under the impression that R. M. Lehman would arrive from the East within a day or two thereafter with money to pay the $12,338.99 first payment called for in the contract. Mr. Lehman did arrive in Salt Lake City on or about January 20, 1921, but he did not pay anything directly on the above contract. No money was ever paid by Klemm to the Mattsons under the last-mentioned contract.

R. M. Lehman was a stockholder in the Boston Acme Mines Corporation (the holding company) and for some time prior to 1920 had been active in selling stock of that company. Prior to October, 1920, the development company had been engaged in metal mining in Morgan county, Utah. The mines corporation furnished the money for such operations. The metal mining venture was not successful. In the fall of 1920 the development company desired to engage in the coal mining business. At this time Lehman came to Utah and spent three of four weeks on the coal mining property involved in this action. The development company paid his expenses. Late in December, 1920, Lehman returned to the East for the purpose of trying to raise a fund of about $50,000 by selling mines corporation stock. A part of this fund was to be used in purchasing the coal lands for the development company under the Klemm contract of October 4, 1920. When Lehman returned to Baltimore he found the finances of both companies in an unsatisfactory condition. The development company did not have enough money to meet its outstanding debts, and the mines corporation was at that time unable to advance the money to pay the debts and to buy the coal land. After some negotiations and perhaps some quarreling, an agreement was reached, on or about January 14, 1921, between the Acme Mines Corporation and Lehman. Lehman had raised $1,130 seemingly from stock sales. The mines corporation raised $2,350 and Lehman, and Bishop, personally, raised $4,520. The mines corporation also gave Lehman $200 for the expenses of his forthcoming trip to Utah with about $8,000 to try to get an extension of the Klemm option and obtain the coal lands for the development company.

When Lehman arrived in Utah on or about January 20, 1921, with said $8,000, he did not go to Klemm, but went directly to the Mattsons and dealt with them for the coal lands. F. A. Mattson and his wife, had deposited with his two brothers a deed, executed by them, for one-third interest

in tract 3, running to "Emil J. Klemm as trustee." Lehman paid the Mattsons $2,616.70 for this deed, and upon receiving it erased the name "Emil J. Klemm" as grantee therein and wrote his own name in place of Klemmn's name. On or about February 3, 1921, Lehman paid the Mattsons the sum of $3,560 on tracts Nos. 2 and 3. Both of said payments were made from said $8,000 Lehman had. He also agreed with the Mattsons that the $1,000 paid to them by the development company in October, 1920, should be credited on the purchase price. Thereafter Lehman paid in successive payments the balance of the purchase price. The total purchase price paid by Lehman, exclusive of the $1,000 for which he took credit as aforesaid, was $29,920.

At or about this period, say on or about April 10, 1921, Lehman organized the Salina Canyon Coal Company, a Utah corporation, and caused the Mattsons to deed tracts Nos. 1 and 2 to it. In organizing said corporation said Lehman caused to be installed as directors himself, his attorney, the brother-in-law of his attorney, one of the Mattsons, and the former geologist or engineer of the development company. Said Lehman caused most of the stock of the Salina Canyon Coal Company to be issued to himself, but did distribute minor allotments to his fellow directors. The Salina Canyon Coal Company began this action against Emil J. Klemm to quiet title to tracts Nos. 1 and 2 and a one-third interest in tract No. 3. The Boston Acme Mines Corporation and the Boston Acme Development Company intervened, making Columbia Trust Company a party and praying that the development company be declared the owner of the property involved. The Columbia Trust Company was made a party because it was trustee under a mortgage Salina Canyon Coal Company had given to secure a proposed bond issue of $500,000 on the coal lands.

The trial court found generally for the Boston Acme Mines Development Company and decreed that it was entitled to the property upon paying to the Salina Canyon Coal

Company, within two years from the date the decree should become final, the $29,920 paid by Lehman to the Mattsons for the property, and interest thereon. The Columbia Trust Company and Klemm were decreed to have no interest in the property. Salina Canyon Coal Company appealed, and the Boston Acme Mines Develpoment Company filed a cross appeal. Other facts will appear in the opinion.

1. The chief contention of the appellant is that the evidence does not support certain findings of fact. We have read the evidence and are of the opinion that every finding is based upon a sufficiency of evidence. No useful purpose would be served by entering upon an analysis of the evidence. We are of the opinion that all the exceptions of the appellant, as well as those of the cross appellant, taken on the ground that findings are unsupported by the evidence or are contrary to the evidence, are without merit. The appellant offered no evidence in its defense. I shall enter upon no lengthy discussion of the multitude of cases cited by the parties to this appeal. After a careful study of the records and briefs in this case, I am clearly of the opinion that the solution of most of the legal questions presented depends upon the proper application of a few plain principles of hornbook law.

2. Appellant further contends that the cross-appellant is a foreign corporation that in point of law was never authorized to do business in the state of Utah. The cross-appellant is an Arizona corporation. It filed its articles with the secretary of state of the state of Utah and obtained a certificate reciting that fact. The point of law made is that our statute required the papers so filed to be certified by the secretary of state of the state of Arizona, and the papers that were actually filed were certified by the Arizona Corporation Commission. Without hesitation I would say that our statutory requirements to the effect that the articles of incorporation of a foreign corporation must be certified by the secretary of state of the state in which

such corporation is chartered is substantially complied with if the certificate is made by a state officer or commission that has the custody of such records and is authorized to certify them under the laws of that state. Presumably the secretary of state of the state of Utah satisfied himself that the articles of incorporation of the development company were properly certified before he filed them. At all events, the objections to the validity of the filing of the articles is in the nature of a collateral attack upon an act of state. Corporate franchises and rights are not to be impeached collaterally for mere irregularity or informality in the papers which move the state to grant the right. *Marsh* v. *Mathias*, 19 Utah 350, 56 P. 1074; *Liter* v. *Ozokerite Min. Co.*, 7 Utah 487, 27 P. 690; *Sakaba Oil Co.* v. *Parish*, 175 Ark. 618, 299 S. W. 1016; *Sun River Stock & Land Co.* v. *Montana T. & S. Bank*, 81 Mont. 222, 262 P. 1039; 1 Fletcher Corps. § 438 and notes; 2 Cook, Corps. (7th Ed.) § 637. The trial court properly decided that the Boston Acme Mines Development Company was authorized to do business in Utah.

3. Appellant further contends that as a matter of law Lehman was in no sense an agent or fiduciary of the development company. The evidence clearly shows that Lehman visited the coal lands in question, in the fall of 1920, and spent some weeks in November and December there in company with Klemm who was a director, secretary, and manager of the development company; that Lehman was familiar with the negotiations Klemm was conducting for the purchase of these lands for the development company and with the option Klemm obtained and the terms thereof; that Lehman obtained $150 from the development company for the very purpose of going back to Baltimore to raise money through the sale of the mines corporation (the holding company) stock or otherwise to enable the development company to complete the purchase of the coal lands. I am of the opinion that the above facts, with-

out more and as a matter of law, created the relationship of agency between the development company and Lehman. But there is more to be said concerning this relation. Lehman obtained $8,000. The mines corporation contributed $2,350 of the said sum upon the express agreement that said money should be used in making payment on the option Klemm held for the development company on the coal lands and in procuring extensions of the same until more money could be raised to pay for the lands. The mines corporation further paid to Lehman at this time $200, to defray the expenses of his trip to Utah. Upon these facts another relationship between the development company and Lehman appears, namely, the relationship of trustee and beneficiary.

Comp. Laws Utah 1917, § 6495, provides:

"Every action must be prosecuted in the name of the real party in interest, except that an executor or administrator, a trustee of an express trust, or a person expressly authorized by statute may sue without joining with him the person for whose benefit the action is prosecuted. A person with whom or in whose name a contract is made for the benefit of another is a trustee of an express trust within the meaning of this section."

It will be noted that the right of certain fiduciaries to sue is an exception to the general mandate that every action must be brought in the name of the real party in interest. The privilege conferred upon the fiduciaries to sue is permissive. Nothing in the statute prohibits the real party in interest from suing in his own name in any proper case. The statute above quoted applies to the case at bar and disposes of a number of questions as to procedure and relationship of parties.

It matters little whether Lehman be called an agent, a trustee, or a fiduciary. The facts of the case establish the nature and measure of his obligation in this transaction. The statute gives the beneficiary, who is the real party in interest, the right to sue. I am of the opinion that Lehman was an agent of the development company, and I am also of the opinion that at the time he

was given the money of the mines corporation and was sent by it to Utah to protect the option of the development company, he, in addition to his agency, became a trustee of an express trust under which the development company was beneficiary. All the conclusions of law and rulings of the trial court to the effect that the development company had the right to intervene, had the right to sue, and had established the fiduciary capacity of Lehman, were properly made. *Montgomery* v. *Rief*, 15 Utah 495, 50 P. 623; *Brown* v. *Markland*, 16 Utah 360, 52 P. 597, 67 Am. St. Rep. 629; *Blyth-Fargo Co.* v. *Free*, 46 Utah 233, 148 P. 427; 13 C. J. pp. 704-711 and notes. All courts hold that a beneficiary under a trust may sue to protect his rights, especially in a case where his interests are hostile to those of the trustee. 39 Cyc. pp. 522-524; Pomeroy, Code Rem. (5th Ed.) §§ 76, 77.

4. The appellant insists and argues at length that the trial court erred in establishing a "constructive trust" in favor of the development company. The trial court in substance and effect found as a fact and concluded as a matter of law that the Salina Coal Company was a ██ mask or identity of Lehman himself and that it acquired the property without consideration and with full notice and knowledge of Lehman's trust obligations and of the rights and equities of the development company. The findings of the court are amply supported by the evidence. The court property held that the Salina Coal Company held the property in trust for the development company. A constructive trust, or as frequently called an involuntary trust, is a fiction of equity, devised to the end that the equitable remedies available against a conventional fiduciary may be available under the same name and processes against one who through fraud or mistake or by any means ex maleficio acquires property of another. Upon the facts in this case the technical name of the trust imposed upon the Salina Coal Company is of little importance.

As a matter of fact and of law, the court did not create any

constructive trust or any other trust. Two trusts are involved in this case and they arise out of the facts found. The trust by which Lehman was bound was an express, executed trust. When the money was placed in Lehman's hands for the purpose of protecting the option, and he accepted it with that understanding, the trust was executed; that is, it then and there became a completed transaction in so far as it fixed obligations upon Lehman and conferred rights upon the development company, 39 Cyc. 195; 3 Pomeroy, Eq. Jur. (4th Ed.) § 1001; 26 R. C. L. pp. 1200, 1201. Where a fiduciary purchases property with trust funds and places the legal title thereto in the name of a third person, who takes with notice or without consideration, a second trust is created in favor of the beneficiary of the first trust. If the relationship of the coal company to the development company must have a name, the coal company may in this case be called a trustee either under a resulting trust or under a constructive trust, 39 Cyc. p. 148.

5. Much is said by appellant about lack of consideration moving from the development company. This matter may be disposed of in a few words. One of the leading cases in equity decied by Lord Eldon more than a century ago, covered this very point. The gist of that decision was that in a case where a voluntary trust has been actually created, and the relation of trustee and beneficiary has sprung into existence, equity will enforce the trust. In other words, as expressed in modern terms, no consideration is necessary in an executed trust. *Ellison* v. *Ellison*, 6 Vesey, 656 (also in White and Tudor's Leading cases Equity). This decision has been followed without dissent in England and in America from that day to this. 3 Pomeroy, Eq. Jur. (4th Ed.) § 996; 26 R. C. L. pp. 1186, 1187. Other minor points of law are argued in the briefs by both parties. Some of these points are based upon a contention or an assumption that the evidence proves or fails to prove some particular

state of facts. As above stated, I hold that the evidence, and I may say the undisputed evidence, supports the findings of fact. The plaintiff Salina Coal Company offered no evidence to rebut the case made by the intervener. Lehman was in court throughout the trial but was not a witness. Under these circumstances, this court is under no obligation to place any strained construction upon the evidence in order to make the case different from what it plainly appears on the record.

6. Appellant further contends that the Boston Acme Mines Corporation is the real party in interest in the transactions involved in this action, that it is a Delaware corporation that never complied with the laws of Utah and did business in this state contrary to law, and therefore has no right to sue through or in the name of the Boston Acme Mines Development Company. The mines corporation is the owner of or has "Scrip" that authorizes it to demand practically all the stock of the development company. The mines corporation is a holding company that furnished money to the development company. I am aware of the fact that there are many cases holding that if a wrongdoer uses the name or mechanism of a corporation as a means for the perpetration of a fraud or as a screen to hide fraud, the arm of equity will reach through the fabric of corporate personality in order to remedy the wrong; but I know of no case holding that equity will nullify a corporate form and personality for the purpose of enabling a wrongdoer to enjoy the fruits of a fraud. It is not necessary to cite authority on this proposition.

7. Both the appellant and the cross-appellant complain of the decree. The decree is that the Salina Canyon Coal Company shall convey the lands to the Boston Acme Mines Development Company upon payment by the latter company to the former of the sum of $29,920, said payment with interest at the rate of 6 per cent per annum from date the decree becomes final, to be made within two years after decree becomes final. Appellant contends

that interest should run from the time Lehman completely paid for the lands and conveyance was made to the Salina Canyon Coal Company, to wit April, 1921. Cross-appellant contends that the amount of the payment should be abated by the sum of $2,350, which is the sum the mines corporation delivered to Lehman to protect the option, and by some other sums for which the development company asks credits. A question worthy of some attention is presented at this point. In answer to appellant's contention that it should have interest from the time it paid the purchase price for the coal lands, it may be said that the aim of the decree in this case is to undo a wrong by restoring the development company, so far as a nunc pro tunc adjudication can restore, to the same position and relationship with respect to the property as it occupied at the time the wrong was committed. The development company was under no obligation to pay interest in 1921. The trial court, without abusing discretion, could have given a time for payment without interest. After nearly nine years of litigation, during which the development company was, by acts of plaintiff, deprived of possession of the property and denied all opportunity to profit from the property or from its bargain therefor, equity cannot look upon the plaintiff's claim for interest with a kindly countenance. For the court to hold that Lehman or his company is entitled to interest for more than eight years would be converting a perverted trust into a profitable investment for an unfaithful trustee at the expense of the beneficiary. I am of the opinion that appellant's objection to the decree is without merit.

The objection of cross-appellant to the omission of the decree to provide an accounting for the $2,350 the mines corporation gave Lehman to pay on the transaction presents a peculiar question pertaining to the findings of fact and the decree. The trial court found as facts that Lehman in purchasing the coal lands took credit on the purchase price of the lands for the $1,000 Klemm (for the development company) had paid thereon and in addition thereto, also used

the funds of the development company in his hands and also used money of his own. The total purchase price paid by Lehman, counting the $1,000 credit he took for the Klemm payment, was $30,920. Leaving the $1,000 credit out of the reckoning, the price paid in cash by Lehman was $29,920, of which $2,350 was the trust fund furnished by the mines corporation for the benefit of the development company. From this it plainly appears that all the money Lehman paid out of his own funds was $26,570.

The $2,350 as shown above was a trust fund given to Lehman to be paid to the Mattsons for the property. It was paid to the Mattsons, but, as it sems, not with the intention of executing the trust. However, the fact that Lehman perverted the trust does not affect the arithmetic of the transaction nor does it nullify the right of the development company to enjoy the benefit of said $2,350. I am of the opinion that the decree should be amended by substituting the words "Twenty-six thousand five hundred and seventy Dollars ($26,570.00)" in the place of and in lieu of the words "Twenty-nine thousand nine hundred and twenty dollars ($29,920.00)" in paragraph 2-A of said decree. This would give the development company credit for the aforesaid $2,350 trust money, which without such amendment would go to the benefit of Lehman or his corporation.

The above payment shall be made within two years after the filing of the remittitur herein, with interest at the rate of 6 per cent per annum from the date of the filing of the remittitur in the court below.

In all other respects the decree is affirmed. Costs to cross-appellant.

STRAUP, ELIAS HANSEN, EPHRAIM HANSON, and FOLLAND, JJ., concur.

CHERRY, C. J., being disqualified, did not participate herein.